UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------------------x
                                 :

*In re:*                              :   **Chapter 11**
                                 :

**CONTRACT RESEARCH SOLUTIONS, INC.,** *et al.,*  :   **Case No. 12-11004 (KJC)**
                                 :

**Debtors.**[1]           :   **Jointly Administered**
                                 :

-------------------------------------------------------------------x

**DISCLOSURE STATEMENT FOR JOINT LIQUIDATING CHAPTER 11 PLAN OF
CONTRACT RESEARCH SOLUTIONS, INC.,** *ET AL.*

Dated:      Wilmington, Delaware
              July 16, 2012

**PAUL HASTINGS LLP**
Luc A. Despins
G. Alex Bongartz
Sung Ho Choi
Park Avenue Tower
75 East 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000

Marc J. Carmel
Christian M. Auty
191 North Wacker Drive, Thirtieth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600

*Counsel to the Debtors and Debtors in Possession*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: Contract Research Solutions, Inc. (3750); Allied Research Holdings Inc. (not applicable); Allied Research International Inc. (Ontario) (not applicable); Allied Research International, Inc. (Florida) (6246); Allied Research International India, LLC (not applicable); Allied Research International U.S., LLC (not applicable); BA Research Co. (not applicable); BA Research International Holdings, LLC (not applicable); BA Research International, L.P. (0418); BARI Management, LLC (not applicable); BARI Merger Sub, LLC (not applicable); BARI Partners, G.P. (0418); Bioassay Research Co. (5944); CRS Management, Inc. (2856); CRS Real Estate Holdings LLC (not applicable); Diabetes and Glandular Disease Research Associates, Inc. (1817); Gateway Medical Research, Inc. (0344); PRACS Dermatology, LLC (not applicable); PRACS Institute, Ltd. (7073); Specialty Research, Inc. (5373). Cetero's corporate headquarters is located at 2000 Regency Parkway, Suite 255, Cary, North Carolina 27518.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................................ 1
II.     SOLICITATION AND VOTING ..................................................................................... 2
        A.      Holders of Claims Entitled to Vote on the Plan ............................................... 2
        B.      Voting Record Date ........................................................................................... 2
        C.      Voting Deadline ................................................................................................. 2
        D.      Confirmation Hearing ....................................................................................... 2
        E.      Objection Deadline ............................................................................................ 2
III.    GENERAL INFORMATION ........................................................................................... 3
        A.      Cetero's Business Overview .............................................................................. 3
        B.      Cetero's Corporate Structure ............................................................................ 3
        C.      Events Leading to the Chapter 11 Filings ........................................................ 3
        D.      Cetero's Prepetition Marketing Process ........................................................... 4
IV.     THE CHAPTER 11 CASES .............................................................................................. 4
        A.      First Day and Second Day Relief ...................................................................... 4
        B.      Sale Motion ....................................................................................................... 5
        C.      Appointment of Committee ............................................................................... 5
        D.      Global Settlement Agreement ........................................................................... 5
V.      THE PLAN .......................................................................................................................... 5
        A.      Classification ..................................................................................................... 5
        B.      Summary of Treatment of Class of Claims ....................................................... 5
        C.      Implementation of the Plan ............................................................................... 7
                1.      Liquidating Trust .................................................................................. 7
                2.      Reorganized CRS ................................................................................. 9
                3.      Record Sharing ................................................................................... 10
        D.      Summary of Procedures for Disputed Claims ................................................ 10
                1.      Objections to Claims and Resolution of Disputed Claims ................. 10
                2.      No Distributions Pending Allowance ................................................. 11
                3.      Estimation ........................................................................................... 11
        E.      Summary of Provisions Governing Distributions .......................................... 11
                1.      Distributions to Holders of Allowed General Unsecured Claims ...... 11
                2.      Calculation of Amounts to be Distributed .......................................... 11
                3.      Undeliverable Distributions and Unclaimed Property ....................... 11
                4.      Minimum Distribution ........................................................................ 12
                5.      Tax Identification ................................................................................ 12
        F.      Bar Dates .......................................................................................................... 12

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 1. | Proofs of Claim | 12 |
| | 2. | Requests for Payment of Administrative Expense Claim | 12 |
| | 3. | Professional Claims and Committee Claims | 12 |
| | 4. | Procedures for Providing Notice of Bar Dates | 13 |
| G. | | Executory Contracts and Unexpired Leases | 13 |
| | 1. | Rejection | 13 |
| | 2. | Claims for Rejection Damages | 13 |
| H. | | Other Plan Provisions | 13 |
| | 1. | Conditions Precedent to the Effective Date | 13 |
| | 2. | Waiver of Conditions Precedent | 13 |
| | 3. | Effect of Non-Occurrence of Conditions to Consummation | 13 |
| | 4. | Restructuring Transactions | 14 |
| | 5. | Dissolution of the Fully Administered Debtors | 14 |
| | 6. | Final Decree Closing the Chapter 11 Cases of the Fully Administered Debtors | 14 |
| | 7. | Dissolution of Reorganized CRS | 14 |
| | 8. | Closing of Chapter 11 Case of Reorganized CRS | 14 |
| | 9. | Corporate Action, Authorizations, and Approvals | 14 |
| | 10. | Government Approvals Not Required | 15 |
| | 11. | Retention of Jurisdiction | 15 |
| | 12. | Pre-Confirmation Modification | 15 |
| | 13. | Post-Confirmation Immaterial Modification | 15 |
| | 14. | Post-Confirmation Material Modification | 15 |
| | 15. | Withdrawal or Revocation of the Plan | 16 |
| | 16. | Plan Supplement | 16 |
| | 17. | Release of Liens | 16 |
| | 18. | Payment of Statutory Fees | 16 |
| | 19. | Requests Pursuant to Bankruptcy Rule 2002 | 16 |
| | 20. | Dissolution of Committee | 16 |
| | 21. | Claims Agent | 16 |
| I. | | Effects of Plan Confirmation | 16 |
| | 1. | Compromise and Settlement of Claims, Equity Interests, and Controversies | 16 |
| | 2. | Releases by the Debtors | 16 |
| | 3. | Releases by Holders of Claims | 17 |
| | 4. | Liabilities to, and Rights of, Governmental Units | 17 |
| | 5. | Exculpation | 17 |

ii

**TABLE OF CONTENTS**
(continued)

Page

|  |  | 6. | Injunction | 18 |
| VI. | CONFIRMATION | | | 18 |
|  | A. | | Requirements for Confirmation | 18 |
|  | B. | | Acceptances Necessary to Confirm Plan | 18 |
|  | C. | | Confirmation Under Section 1129(b) of the Bankruptcy Code | 18 |
|  | D. | | Best Interests of Creditors | 19 |
|  | E. | | Feasibility | 20 |
| VII. | RISK FACTORS | | | 20 |
|  | A. | | Disclosure Statement May Not Be Approved | 20 |
|  | B. | | Plan May Not Be Accepted or Confirmed | 20 |
| VIII. | TAX CONSEQUENCES | | | 20 |
| IX. | CONCLUSION AND RECOMMENDATION | | | 20 |

**EXHIBITS**

EXHIBIT A     Plan

EXHIBIT B     Solicitation Procedures Order

### NOTICE

NO ENTITY MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE JOINT LIQUIDATING CHAPTER 11 PLAN OF CONTRACT RESEARCH SOLUTIONS, INC., *ET AL.*, DATED AS OF JULY 16, 2012 (INCLUDING ALL EXHIBITS ANNEXED THERETO AND THE PLAN SUPPLEMENT, AS MAY BE ALTERED, AMENDED, OR MODIFIED FROM TIME TO TIME, THE "PLAN") OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**THE DEADLINE FOR VOTING TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 24, 2012, UNLESS EXTENDED. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY SUCH DEADLINE.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL, STATE, OR PROVINCIAL SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF CETERO SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS LEADING TO THESE CHAPTER 11 CASES AND FINANCIAL INFORMATION. ALTHOUGH CETERO BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF CETERO, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. CETERO IS UNABLE TO AND DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF VOTING TO ACCEPT OR REJECT AND TO CONSIDER WHETHER TO OBJECT TO THE THIRD PARTY RELEASE IN THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THOSE. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF CETERO OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH ENTITY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING CETERO OR ANY OTHER ENTITY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE RESTRUCTURING AS TO

HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN CETERO. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE RESTRUCTURING ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT SET FORTH IN ARTICLE 12 OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.

**IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER, CETERO WILL SEEK APPROVAL OF THIS DISCLOSURE STATEMENT AT THE CONFIRMATION HEARING. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

## I.    INTRODUCTION

Contract Research Solutions, Inc. ("CRS") and its affiliated debtors as debtors in possession in the above-captioned cases (collectively, "Cetero") submit this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code to holders of Claims against Cetero in connection with the solicitation of votes to accept or reject the Plan, and to provide creditors with an opportunity to object to the third party release contained in the Plan. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for CRS and each of its 19 affiliated debtors. Capitalized terms used, but not otherwise defined in this Disclosure Statement, shall have the meanings set forth in the Plan.

CETERO, THE FIRST LIEN AGENTS, AND THE SECOND LIEN AGENT BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF CETERO'S ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS. AT THIS TIME, CETERO, THE FIRST LIEN AGENTS, THE SECOND LIEN AGENT, AND THE COMMITTEE BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. CETERO STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

Cetero is pleased that after extensive, good faith negotiations, the Plan embodies and implements the final stage of the Sale Support Agreement and the Global Settlement Agreement among Cetero's major stakeholders. On June 20, 2012, the sale of substantially all of Cetero's assets to affiliates of the First Lien Agent (the "Sale") closed. With the consummation of the Sale, Cetero has liquidated substantially all of its assets.

In accordance with the Sale Support Agreement, the Global Settlement Agreement, the Final DIP Order, and the Sale Order, the Plan provides for the wind-down of Cetero's estates and contemplates satisfying Allowed Claims through the following sources, which were funded by Cetero upon the closing of the Sale:

- GUC Designated Funds: Allowed Committee Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, the Liquidating Trustee Fees and other costs incurred by the Liquidating Trust, and Statutory Fees shall be paid by the Liquidating Trustee, in accordance with the Plan, from the Liquidating Trust Assets. All Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied. The GUC Designated Funds may also be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

- Wind-Down Funds: Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, the Wind-Down Administrator Fees and other cost incurred for the administration of the Wind-Down Funds, and Allowed First Lien Claims shall be paid by the Wind-Down Administrator, in accordance with the Plan, from the Wind-Down Funds; *provided, however*, that any Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied.

- Carve-Out Funds: Allowed Professional Claims, to the extent incurred prior to the closing of the Sale, and other fees and expenses, as provided in the Final DIP Order, shall be paid by the Wind-Down Administrator, in accordance with the Plan and the Final DIP Order, from the Carve-Out Funds. Any Carve-Out Funds remaining in the Carve-Out Account after such payments, shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement).

If you have any questions regarding this Disclosure Statement or the Plan, or wish to obtain copies of the Disclosure Statement, the Plan, or any other pleadings filed in the Chapter 11 Cases, you should contact Epiq Bankruptcy Solutions, LLC, the Voting and Claims Agent, by: (a) calling (646) 282-2400; (b) visiting http://dm.epiq11.com/crs; or (c) writing to Contract Research Solutions, Inc., c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, New York 10017. You may also obtain copies of any pleadings filed in Cetero's Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov.

## II.    SOLICITATION AND VOTING

This Disclosure Statement is being distributed to the holders of Class 3 First Lien Claims and Class 4 Second Lien Claims, which are Entities entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the *Order, Pursuant to Bankruptcy Code Sections 105, 502, 1123(a), 1124, 1125, 1126, And 1128, Bankruptcy Rules 2002, 3003, 3016, 3018, and 3020, and Local Rules 2002-1 And 3017-1: (A) Scheduling a Combined Hearing on Approval of Disclosure Statement and Confirmation of Plan; (B) Approving Form and Manner of Notice of Combined Hearing; (C) Approving Solicitation Packages, Including Form of Ballot, and Procedures for Distribution of Solicitation Packages; and (D) Approving Voting Record Date and Voting Deadline*, dated July 10, 2012 [Docket No. 466] (the "Solicitation Procedures Order"), which is attached hereto as Exhibit B. The Solicitation Procedures Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan. The discussion of the solicitation and voting procedures set forth in this Disclosure Statement is only a summary.

**A.**    **Holders of Claims Entitled to Vote on the Plan.** Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. Specifically, pursuant to the Plan, only holders of Class 3 First Lien Claims and Class 4 Second Lien Claims (collectively, the "Voting Classes") are entitled to vote to accept or reject the Plan. Cetero is **not** soliciting votes from holders of Claims and Equity Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Equity Interests).

**B.**    **Voting Record Date.** The date for determining (a) the holders of Claims entitled to vote to accept or reject the Plan and (b) whether claims have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of such claim, is **July 16, 2012.**

**C.**    **Voting Deadline.** All holders of claims in the Voting Classes must complete, execute, and return their Ballots so as to be actually received by the Voting and Claims Agent on or before **August 24, 2012 at 4:00 p.m. (prevailing Eastern Time).** Ballots should be mailed to the following addresses:

| If by regular mail: | If by overnight courier or hand delivery: |
|---|---|
| Cetero Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>Voting and Claims Agent for Contract Research<br>    Solutions, Inc., et al.<br>F.D.R. Station<br>P.O. Box 5014<br>New York, New York10150-5014 | Cetero Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, New York 10017 |

**D.**    **Confirmation Hearing.** The Court shall consider approval of the Disclosure Statement and confirmation of the Plan at the hearing to be held on **September 11, 2012 at 11:00 a.m. (prevailing Eastern Time).** The Confirmation Hearing will be held in the courtroom of the Honorable Kevin J. Carey in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Fifth Floor, Wilmington, Delaware 19801. At the Confirmation Hearing, the Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code in order for it to be confirmed. In addition, in accordance with the Solicitation Procedures Order, at the Confirmation Hearing, the Court will also consider approval of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Court or Cetero without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court.

**E.**    **Objection Deadline.** Pursuant to the Solicitation Procedures Order, the Court has directed that objections, if any, to the approval of the Disclosure Statement or confirmation of the Plan (or requests for modification of the Plan, if any) must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon following parties: (a) counsel for Cetero, Paul Hastings LLP, 191 North Wacker Drive, Thirtieth Floor, Chicago, Illinois 60606, Attn: Marc J. Carmel, Email: marccarmel@paulhastings.com, and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary, Email: mbcleary@ycst.com; (b) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: David M. Klauder; (c) counsel for the Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, Email:

bsandler@pszjlaw.com, and 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4003, Shirley S. Cho, Email: scho@pszjlaw.com; and (d) counsel to the U.S. agent under Cetero's prepetition secured credit facilities, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606, Attn: Peter Knight, Email: peter.knight@lw.com; so as to be **actually received** on or before **August 24, 2012 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline"). Any entity whose response or objection to the approval of the Disclosure Statement or confirmation of the Plan is not timely filed and served before the Objection Deadline in accordance with the foregoing procedures shall be barred from objecting to the approval of the Disclosure Statement and confirmation of the Plan, respectively, and be precluded from being heard at the Combined Hearing.

**Any holder of a claim who desires to object to or not be bound by the third party release contained in Section 11.3 of the Plan (the "Third Party Release") must file an objection to the Plan objecting to the Third Party Release in accordance with the foregoing procedures. For those holders of claims that do not object, the Third Party Release is enforceable. In addition, a vote to reject the Plan shall be deemed an objection to the Third Party Release.**

**III. GENERAL INFORMATION**

**A. Cetero's Business Overview.** Before the Petition Date, Cetero was the leading full-service contract research organization in North America. Through project management, clinical trials, bioanalytical analysis services, data management, statistical analysis, and report writing, Cetero provided pharmaceutical and biotechnology companies with an integrated means of managing and conducting clinical trials for the development of drugs and medical services. Cetero operated five leading state-of-the-art clinical pharmacology facilities throughout North America, with approximately 1,400 patient beds, as well as two bioanalytical laboratories to service its diverse customer base. Among Cetero's over 200 customers were many of the world's largest and well-known generic, large pharmaceutical and small-to-midsized biotechnology companies.

**B. Cetero's Corporate Structure.** Before the Petition Date, Cetero had approximately $185 million in funded prepetition indebtedness and related obligations, comprised of:

- a term facility and a revolving facility under that First Lien Credit Agreement, by and among PRACS Institute, Ltd. ("PRACS") as U.S. borrower, Allied Research Holdings Inc. ("Allied") as Canadian borrower, and Freeport Financial LLC ("Freeport") as U.S. agent, Bank of Montreal, as Canadian agent, and other First Lien Lenders;

- a term facility under that certain Second Lien Credit Agreement, by and among PRACS as borrower, Freeport as agent for the lenders, and other Second Lien Lenders;

- unsecured indebtedness owed to (i) CMS/KRG Capital Fund III, L.P. and (ii) KRG Capital Fund III, L.P. and certain of its affiliates, which indebtedness was used to fund the purchase of a building in San Antonio, Texas; and

- an approximately $26 million financing of a building owned by PRACS in Fargo, North Dakota.

A detailed summary of Cetero's businesses, corporate history, organizational structure and prepetition capital structure may be found in the *Declaration of Michael T. Murren in Support of Cetero's First-Day Motions*, filed on the Petition Date [Docket No. 2] (the "First Day Declaration"), which is incorporated herein by reference.

**C. Events Leading to the Chapter 11 Filings.** A number of factors contributed to Cetero's decision to commence the Chapter 11 Cases. Although Cetero was a leading full-service contract research organization in North America, Cetero's substantial debt burden became unsupportable after Cetero learned that six research chemists at its Houston, Texas bioanalytical laboratory had recorded inaccurate date and time data purportedly to obtain additional compensation through weekend pay and pay for hours that the chemists did not actually work. Upon learning of the chemists' practices, Cetero conducted an internal investigation to assess the situation and hired a third party consultant to conduct independent review and investigation regarding allegations of potential misconduct at Cetero's Houston facility. After Cetero completed its internal investigation in June 2009, it delivered a notification to the FDA's District Office in Dallas.

On July 26, 2011, the FDA sent an untitled letter (the "July 2011 FDA Letter") to Cetero in which the FDA expressed concern regarding the veracity of studies that had been conducted at Cetero's Houston bioanalytical laboratory between April 2005 and June 2010. The FDA ultimately required that certain clinical studies that may have been affected by the research chemists' inaccurate time recordings and by their preparation of samples must be repeated to confirm the data results in those studies (the "Rework"). The FDA did not require that Cetero perform

3

the Rework; rather, the requirement applies to certain of Cetero's customers. The issuance of the July 2011 FDA Letter did, however, cause Cetero's liquidity position to become severely constrained. This unfortunate incident led to liquidity issues based on their impact on revenue, increased expenses, and time and attention invested by management to address the situation. In addition, general economic and industry trends resulted in less research and development conducted by drug companies. For more information, as well as the strategic alternatives that Cetero explored prepetition, see the First Day Declaration.

**D.**     **Cetero's Prepetition Marketing Process.** Before the Petition Date, Cetero retained Jefferies & Company, Inc. ("Jefferies") to provide investment banking services and to coordinate the potential sale of substantially all of Cetero's assets through an auction supported by a stalking horse bidder. Beginning in October, 2011, Jefferies conducted an extensive marketing process (the "Prepetition Marketing Process") focused on identifying strategic and financial buyers for Cetero's assets. In addition, Cetero commenced discussions with certain First Lien Lenders, who indicated their willingness to enter into an asset purchase agreement at a higher amount through a credit bid than was indicated by third parties contacted by Jefferies. The First Lien Lenders also agreed to provide committed debtor-in-possession financing to fund the Chapter 11 Cases, allow for Cetero to conduct an appropriate marketing process postpetition, and provide for a wind-down of the estates. On March 25, 2012, after extensive negotiations, certain First Lien Lenders and certain Second Lien Lenders pledged their support for Cetero's sale efforts by entering into a sale support agreement (the "Sale Support Agreement") with Cetero, a copy of which is attached to the First Day Declaration [Docket No. 2, Exhibit A]. Pursuant to the Sale Support Agreement, the lenders party thereto agreed, among other things, to (a) support a 363 sale of substantially all of Cetero's assets, (b) make a credit bid as stalking horse bidder to purchase such assets, and (c) provide postpetition financing to fund the Chapter 11 Cases and the orderly wind-down of Cetero's estates.

**IV.**     **THE CHAPTER 11 CASES**

On March 26, 2012 (the "Petition Date"), the Cetero entities filed their petitions for relief under chapter 11 of the Bankruptcy Code.

**A.**     **First Day and Second Day Relief.** On the Petition Date, Cetero filed several motions seeking various first day and second day relief, including:

- a motion for an order directing joint administration of the Chapter 11 Cases [Docket No. 3], which was approved by the Bankruptcy Court on March 27, 2012 [Docket No. 34];

- a motion for an order approving (i) continued use of Cetero's prepetition cash management system, existing bank accounts, and existing business forms, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) deeming intercompany obligations as administrative expenses, and (iv) waiving the requirements of section 345(b) of the Bankruptcy Code [Docket No. 8], which was approved by the Bankruptcy Court on an interim basis on March 27, 2012 [Docket No. 39] and on a final basis on April 23, 2012 [Docket No. 163];

- a motion for an order (a) authorizing Cetero to (i) pay certain employee compensation and benefits and (ii) maintain and continue such benefits and other employee-related programs and (b) authorizing and directing banks and financial institutions to honor and process checks and transfers related to such obligations [Docket No. 9], which was approved by the Bankruptcy Court on an interim basis on March 27, 2012 [Docket No. 40] and on a final basis on April 23, 2012 [Docket No. 164];

- a motion for an order authorizing Cetero to perform bioanalytical rework and to conduct paper audits of certain clinical studies performed prepetition, which may have been affected by the time recordation practices of certain research chemists at its Houston bioanalytical laboratory [Docket No. 10], which was approved by the Bankruptcy Court on an interim basis on March 27, 2012 [Docket No. 42] and on a final basis on April 23, 2012 [Docket No. 165];

- a motion to appoint CRS as Cetero's foreign representative to enable CRS to seek ancillary relief before the Ontario Superior Court of Justice (Commercial List) [Docket No. 11], which was approved by the Bankruptcy Court on March 27, 2012 [Docket No. 43]; and

- a motion for an order (i) authorizing Cetero (a) to obtain postpetition secured financing and (b) to utilize cash collateral, (ii) granting adequate protection to prepetition secured parties, and (iii) scheduling a final hearing [Docket No. 13], which was approved by the Bankruptcy Court on an interim basis on March 27, 2012 [Docket No. 45] and on a final basis on May 9, 2012 [Docket No. 251]. The final order granted Cetero access to an aggregate amount of $15 million in new postpetition financing.

4

Additional first day and second day relief included orders concerning the payment of Cetero's prepetition taxes [Docket No. 37], Cetero's workers compensation and insurance programs [Docket No. 38], and Cetero's utility service providers [Docket Nos. 36, 162, and 176]. The Court also approved the retention of various estate professionals, including Paul Hastings LLP and Young Conaway Stargatt & Taylor LLP, as counsel to Cetero [Docket Nos. 156, 161], Stikeman Elliott LLP, as Canadian counsel to Cetero [Docket No. 167], Jefferies & Company, Inc., as financial advisor to Cetero [Docket No. 154], Carl Marks Advisory Group, LLC, as restructuring advisor to Cetero [Docket No. 155], Epiq Bankruptcy Solutions, LLC, as administrative advisor and notice and claims agent to Cetero [Docket Nos. 35 and 175].

**B.      Sale Motion.** On the Petition Date, Cetero also filed a motion for authorization to conduct a stalking horse sale process in which affiliates of the First Lien Lenders served as a stalking horse bidder [Docket No. 15] (the "Sale Motion"). On April 13, 2012, the Bankruptcy Court issued an order [Docket No. 111] (the "Bidding Procedures Order") approving the bidding procedures, including the stalking horse bidder, the form and manner of notices regarding the sale, and procedures governing the assumption and assignment of contracts and leases. Cetero, with Jefferies and its other advisors, continued the marketing and sale process to obtain higher or otherwise better bids from third parties. However, by the bid deadline, no additional bids had been submitted. On May 17, 2012, the Bankruptcy Court entered an order authorizing the sale of substantially all of Cetero's assets to the stalking horse bidder [Docket No. 345] (the "Sale Order"). The Sale closed on June 20, 2012.

**C.      Appointment of Committee.** On April 5, 2012, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 91]. The Committee consists of the following members: (a) MacKinnon Calderwood Advertising; (b) Cytoquest Corp.; and (c) Gate (MO) QRS 16-95, Inc. On April 5, 2012, the Committee selected Pachulski Stang Ziehl & Jones LLP as its legal counsel and Morris Anderson & Associates, Ltd. as its financial advisor.

**D.      Global Settlement Agreement.** Soon after the appointment of the Committee, Cetero, the First Lien Agents, the Second Lien Agent, and the Committee engaged in negotiations to ensure a successful wind-down for the benefit of stakeholders. As a result of these negotiations, Cetero, the First Lien Agents, certain of the First Lien Lenders, the Second Lien Agent, certain of the Second Lien Lenders, the agent for the DIP Facility, and the Committee reached a global settlement of all issues related to the Chapter 11 Cases (the "Global Settlement Agreement"). Cetero filed a motion seeking approval of the Global Settlement Agreement on May 1, 2012 [Docket No. 201], which was approved by the Bankruptcy Court on May 11, 2012 [Docket No. 258].

All of the foregoing motions and orders can be found and viewed free of charge at http://dm.epiq11.com/crs.

**V.      THE PLAN**

**A.      Classification.** The Plan constitutes a separate chapter 11 plan for each Cetero entity and, unless otherwise explained herein, the classifications set forth in Classes 1 through 7 shall be deemed to apply to each Cetero entity, as applicable. For purposes of organization, voting, and all confirmation matters with respect to Claims and Equity Interests, the Plan classifies the Claims against and the Equity Interests in each Cetero entity as follows:

| Class | Claims/Equity Interest | Status | Voting Rights |
|-------|------------------------|--------|---------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept the Plan |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to accept the Plan |
| Class 3 | First Lien Claims | Impaired | Entitled to vote on the Plan |
| Class 4 | Second Lien Claims | Impaired | Entitled to vote on the Plan |
| Class 5 | General Unsecured Claims | Impaired | Deemed to reject the Plan |
| Class 6 | Intercompany Claims | Impaired | Deemed to reject the Plan |
| Class 7 | Equity Interests | Impaired | Deemed to reject the Plan |

**B.      Summary of Treatment of Class of Claims.** The following chart provides a summary of the anticipated recovery to holders of Claims and Equity Interests under the Plan.

| Class | Claim/Equity Interest | Anticipated Recovery |
|-------|-----------------------|----------------------|
| NA | Allowed Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim: (a) the unpaid amount of such Allowed Administrative Expense Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) |

| | | |
|---|---|---|
| | | Business Days after such Claim becomes an Allowed Administrative Expense Claim; or (b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee (in the case of Allowed 503(b)(9) Administrative Expense Claims) or the Wind-Down Administrator (in the case of Allowed Other Administrative Expense Claims). |
| NA | Allowed Priority Tax Claims | Each holder of an Allowed Priority Tax Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim: (a) the amount of such Allowed Priority Tax Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Priority Tax Claim; or (b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee. Allowed Priority Tax Claims shall be paid from the GUC Designated Funds; *provided, however,* that any Allowed Priority Tax Claims shall be satisfied first by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied in full. |
| 1 | Allowed Priority Non-Tax Claims | Each holder of an Allowed Priority Non-Tax Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive (a) the amount of such Allowed Priority Non-Tax Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Priority Claim; or (b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee. Allowed Priority Non-Tax Claims shall be paid from the GUC Designated Funds; *provided, however,* that any Allowed Priority Non-Tax Claims shall be satisfied first by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied in full. |
| 2 | Allowed Other Secured Claims | Each holder of an Allowed Other Secured Claim that is not assumed or satisfied by the Purchaser as part of the Sale shall, in exchange for full and final satisfaction, settlement, release and discharge of such Claim, receive either: <br><br> (a)  Cash equal to the amount of such Allowed Other Secured Claim or such other amount as may be agreed upon by the Wind-Down Administrator and the holder of such Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Other Secured Claim, and all Liens, Claims, charges, or other encumbrances asserted by the holder of such Allowed Other Secured Claim shall be extinguished and of no further force or effect; or <br><br> (b)  subject to the Sale, a return of the collateral or other property that secures the Allowed Other Secured Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Other Secured Claim, and all Liens, Claims, charges, or other encumbrances asserted by the holder of such Allowed Other Secured Claim shall be extinguished and of no further force or effect. <br><br> An Allowed Other Secured Claims paid in accordance with the foregoing subclause (a) shall be paid from the Wind-Down Funds; *provided, however,* that the GUC Designated Funds may be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget. |
| 3 | Allowed First Lien Claims | In exchange for full and final satisfaction, settlement, release, and discharge of the First Lien Claims, and in addition to the consideration received by the holders of First Lien |

6

| | | |
|---|---|---|
| | | Claims under the Final DIP Order and the Sale Order: |
| | | (a) each holder of an Allowed First Lien Claim shall receive the exculpation and releases set forth in the Plan; |
| | | (b) the Surplus Wind-Down Funds, if any, shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement) as soon as practicable after all payments on account of Allowed Other Administrative Expense Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Wind-Down Administrator Fees and other costs incurred for the administration of the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget, in each case pursuant to and in accordance with the Plan, have been made from the Wind-Down Funds; and |
| | | (c) after satisfaction from the Carve-Out Funds of all Allowed Professional Claims incurred prior to the closing of the Sale, any Carve-Out Funds remaining in the Carve-Out Account shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement) as soon as practicable after the payment of such Allowed Professional Claims. |
| | | The holders of First Lien Claims have agreed to subordinate certain of their rights to receive the GUC Designated Funds, the Wind-Down Funds, and the Carve-Out Funds in favor of (a) holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims and (b) Liquidating Trustee Fees and other costs incurred by the Liquidating Trust, Wind-Down Administrator Fees and other costs incurred for the administration of the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget, and Statutory Fees, each of which shall receive the treatment accorded to them in the Plan. |
| 4 | Allowed Second Lien Claims | In exchange for full and final satisfaction, settlement, release, and discharge of the Second Lien Claims, each holder of an Allowed Second Lien Claim shall receive the exculpation and releases set forth herein. |
| 5 | Allowed General Unsecured Claims | Each holder of an Allowed General Unsecured Claim may, in exchange for full and final satisfaction, settlement, release and discharge of such Claim, receive a distribution from the Net GUC Designated Funds to the extent determined by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement. Allowed General Unsecured Claims shall be paid by the Liquidating Trustee solely from the Net GUC Designated Funds. |
| 6 | Allowed Intercompany Claims | Intercompany Claims shall be released, waived, and discharged on the Effective Date. Holders of Intercompany Claims will not be entitled to, and will not receive or retain any property under the Plan on account of Intercompany Claims. |
| 7 | Allowed Equity Interests | The Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Equity Interests will not be entitled to, and will not receive or retain, any property under the Plan on account of the Equity Interests. |

**C.    Implementation of the Plan**

1.    Liquidating Trust

 (a) *Establishment of Liquidating Trust.*  On the Effective Date, the Liquidating Trust shall be established hereunder and pursuant to the Liquidating Trust Agreement for the sole purpose of administering the Liquidating Trust Assets, with no objective to continue or engage in the conduct of a trade or business.

 (b) *Liquidating Trustee.*  On the Effective Date, the Liquidating Trustee shall be appointed as the trustee for the Liquidating Trust in accordance with the Liquidating Trust Agreement and shall have all the rights and powers set forth in the Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall serve without any bond and shall act in accordance with the Liquidating Trust Agreement and the Plan.

 (c) *Funding of the Liquidating Trust.*  On the Effective Date, the Liquidating Trust Assets shall vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries free and clear of all Liens, Claims, charges, or other encumbrances. The Plan shall be considered a motion pursuant to section 105, 363, and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Liquidating Trust Beneficiaries. The Liquidating Trust shall not be deemed a successor in interest of Cetero for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. The Liquidating Trust Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust.

 In connection with the transfer of the Liquidating Trust Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust will vest in the Liquidating Trust and its representatives, and Cetero and the Liquidating Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

 (d) *GUC Designated Funds.*  All Allowed Committee Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, the Liquidating Trustee Fees and other costs incurred by the Liquidating Trust, and Statutory Fees shall be paid by the Liquidating Trustee, in accordance with the Plan, from the Liquidating Trust Assets. All Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied. The GUC Designated Funds may also be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

 (e) *Powers of the Liquidating Trustee.*  The Liquidating Trustee shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) initiate, file, or prosecute objections to Claims, in accordance with Section 7.1.1 of the Plan, including seeking the examination of any Entity under and subject to the provisions of Bankruptcy Rule 2002 in connection thereof; (c) stand in the shoes of each of the Debtors for all purposes in connection with the prosecution of or objections to such Claims; (d) make all distributions contemplated to be made by it under the Plan; (e) employ professionals to represent it with respect to its responsibilities; (f) pay the Liquidating Trustee Fees and other costs incurred by the Liquidating Trust; (g) file final federal, state, foreign, and, to the extent applicable, local tax returns, and, to the extent necessary, pay such taxes from the GUC Designated Funds; (h) represent each of the Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the GUC Designated Funds or any Liquidating Trust Beneficiary; and (i) exercise such other powers as may be vested in the Liquidating Trustee by the Bankruptcy Court, pursuant to the Plan or the Liquidating Trust Agreement, or as deemed by the Liquidating Trustee to be necessary or proper to implement the provisions hereof. The Liquidating Trustee shall file all reports and undertake all actions, not otherwise specified in the Plan, required by the Bankruptcy Code and the Bankruptcy Rules.

 (f) *Exculpation/Indemnification.*  The Liquidation Trustee and its employees, professionals, agents, or representatives, if any, shall be entitled to the protections set forth in the Liquidating Trust Agreement with regard to exculpation and indemnification provisions.

 (g) *Expenses Incurred on or After the Effective Date.*  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Liquidating Trustee on or after the Effective Date (including taxes), any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Liquidating Trustee, and any other reasonable costs incurred by the Liquidating Trust shall be paid in Cash solely from the GUC Designated Funds without any further order of the Bankruptcy Court in accordance with the Liquidating Trust Agreement. For the avoidance of doubt,

costs and fees incurred by the Claims Agent in connection with processing proofs of Claims shall be paid by the Liquidating Trustee and shall be deemed Liquidating Trustee Fees for purposes of the Plan.

      *(h)*    *Termination.* The Liquidating Trust shall terminate when the Liquidating Trustee has performed all of its duties under the Plan and the Liquidating Trust Agreement, including the final distribution of all the property of the Liquidating Trust, which date shall not be more than five (5) years after the Effective Date; *provided, however,* the Court may upon good cause shown order the Liquidating Trust to remain open so long as it may be necessary to liquidate and distribute all of its property.

      *(i)*    *Records.* The Liquidating Trustee shall maintain good and sufficient books and records of account relating to the GUC Designated Funds, the management thereof, all related transactions undertaken, all fees and expenses incurred by the Liquidating Trustee, and all distributions contemplated or effectuated under the Plan. Upon the entry of a Final Decree closing the Chapter 11 Case of Reorganized CRS, the Liquidating Trustee may destroy or otherwise dispose of all records maintained by the Liquidating Trustee.

2.    Reorganized CRS

      *(a)*    *Vesting of Assets in Reorganized CRS.* Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, and except as set forth in the DIP Order and the Sale Order, on the Effective Date, all property in each Estate and any property acquired by any of the Debtors pursuant to the Plan, including the Wind-Down Funds, shall vest in Reorganized CRS, free and clear of all Liens, Claims, charges, or other encumbrances. In addition, on the Effective Date, the Carve-Out Funds shall be transferred to Reorganized CRS.

      *(b)*    *Limited Survival of Reorganized CRS.* From and after the Confirmation Date, Reorganized CRS shall continue in existence for the sole purpose of administering, through the Wind-Down Administrator, the assets vested in it pursuant to Section 6.2.1 of the Plan, including the Wind-Down Funds and the Carve-Out Funds, with no objective to continue or engage in the conduct of a trade or business. From and after the Effective Date, the Wind-Down Administrator shall be deemed the sole shareholder and shall be appointed as the sole director and officer of Reorganized CRS (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by the Plan to permit and authorize such appointment) and shall serve in such capacity until the dissolution of Reorganized CRS pursuant to the Plan. All corporate governance activities of Reorganized CRS shall be exercised by the Wind-Down Administrator, subject to the terms of the Plan.

      *(c)*    *Liquidation of Assets.* On and after the Effective Date, Reorganized CRS, through the Wind-Down Administrator, may, without further approval of the Bankruptcy Court, use, sell, assign, transfer, abandon, or otherwise dispose of at a public or private sale any of the Estate Assets (other than the Liquidating Trust Assets, the Wind-Down Funds, and the Carve-Out Funds) for the purpose of liquidating and converting such assets to Cash, making distributions and fully consummating the Plan. Any Cash proceeds from such Estate Assets shall be added to the Wind-Down Funds and deposited into the Wind-Down Funds Account, and shall become available for distributions by the Wind-Down Administrator in accordance with the provisions of the Plan.

      *(d)*    *Wind-Down Funds.* The Wind-Down Funds shall be held by Reorganized CRS for the benefit of the holders of Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, and Allowed First Lien Claims. All Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, the Wind-Down Administrator Fees and other cost incurred for the administration of the Wind-Down Funds, and Allowed First Lien Claims shall be paid by the Wind-Down Administrator, in accordance with the Plan, from the Wind-Down Funds; *provided, however,* that any Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied.

      *(e)*    *Carve-Out Funds.* The Carve-Out Funds shall be held by Reorganized CRS for the benefit of the holders of Allowed Professional Claims, to the extent incurred prior to the closing of the Sale, and as provided in the Final DIP Order. All Allowed Professional Claims, to the extent incurred prior to the closing of the Sale, and other fees and expenses, as provided in the Final DIP Order, shall be paid by the Wind-Down Administrator, in accordance with the Plan and the Final DIP Order, from the Carve-Out Funds. Any Carve-Out Funds remaining in the Carve-Out Account after such payments shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement).

(f)        *Powers of the Wind-Down Administrator.* The Wind-Down Administrator shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) initiate, file, or prosecute objections to Claims, in accordance with Section 7.1.2 of the Plan, including seeking the examination of any Entity under and subject to the provisions of Bankruptcy Rule 2002 in connection thereof; (c) stand in the shoes of each of the Debtors for all purposes in connection with the prosecution of or objections to such Claims; (d) make all distributions contemplated to be made by it under the Plan; (e) employ professionals to represent it with respect to its responsibilities; (f) pay the Wind-Down Administrator Fees and other costs incurred for administering the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget; (g) represent each of the Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Wind-Down Funds or the Carve-Out Funds; and (h) exercise such other powers as may be vested in the Wind-Down Administrator by the Bankruptcy Court, pursuant to the Plan, or as deemed by the Wind-Down Administrator to be necessary or proper to implement the provisions hereof.

(g)        *Expenses Incurred on or After the Effective Date.* Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Wind-Down Administrator on or after the Effective Date (including taxes), any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Wind-Down Administrator, and any other reasonable costs incurred for the administration of the Wind-Down Funds shall be paid up to the amount provided in the Final Wind-Down Budget in Cash from the Wind-Down Funds without any further order of the Bankruptcy Court.

(h)        *Termination.* The duties, responsibilities, and powers of the Wind-Down Administrator shall terminate after all Wind-Down Funds have been distributed in accordance with the Plan.

(i)        *Records.* The Wind-Down Administrator shall maintain good and sufficient books and records of account relating to the Wind-Down Funds, the management thereof, all related transactions undertaken, all fees and expenses incurred by the Wind-Down Administrator, and all distributions contemplated or effectuated under the Plan. Upon the dissolution of CRS, and after offering to provide such records to the Liquidating Trustee upon 15 days prior written notice, the Wind-Down Administrator may destroy or otherwise dispose of all records maintained by Wind-Down Administrator. The costs of any transfer of records to the Liquidating Trustee shall be borne by the Liquidating Trust.

3.        Record Sharing. Each of the Liquidating Trustee, the Wind-Down Administrator, and the Purchasers shall, upon reasonable request by the other, share its respective books and records relating to Cetero, including the Sale, the Chapter 11 Cases, and the Canadian Proceedings, or provide reasonable access thereto. Reorganized CRS shall provide access to the Liquidating Trustee to Reorganized CRS's books and records in respect of Claims being administered by the Liquidating Trustee and shall not dispose of any such books and records without the prior consent of the Liquidating Trustee.

## D.    **Summary of Procedures for Disputed Claims**

1.        Objections to Claims and Resolution of Disputed Claims.

(a)        *Authority of Liquidating Trustee to Object to* Claims. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Liquidating Trustee shall be authorized, and vested with the right, to object to any and all 503(b)(9) Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and General Unsecured Claims and initiate, file, or prosecute such objections on behalf of Cetero and its Estates so as to have the Bankruptcy Court determine the Allowed amount, if any, of such Claims to be paid under the Plan. Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee may also object to any Claims set forth in Section 7.1.2 of the Plan with the consent of the Wind-Down Administrator. All objections to Claims must be filed with the Bankruptcy Court and served only upon the holder of the Claim by no later than the Claims Objection Deadline or such later date set by order of the Bankruptcy Court upon the motion of the Liquidating Trustee. Responses and litigation over the allowance of any Claim that is the subject of an objection shall be governed by the Bankruptcy Code, the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court. From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Liquidating Trustee elects to withdraw such objection or elects to compromise, settle, or otherwise resolve any such objection in its sole and absolute discretion.

(b)        *Authority of Wind-Down Administrator to Object to Claims.* Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Wind-Down Administrator shall be authorized, and vested with the right, to object to any and all Other Administrative Expense Claims and Other

Secured Claims, and initiate, file, or prosecute such objections on behalf of Cetero and its Estates so as to have the Bankruptcy Court determine the Allowed amount, if any, of such Claims to be paid under the Plan. Notwithstanding anything to the contrary in the Plan, the Wind-Down Administrator may also object to any Claims set forth in Section 7.1.1 of the Plan with the consent of the Liquidating Trustee. All objections to Claims must be filed with the Bankruptcy Court and served only upon the holder of the Claim, by no later than the Claims Objection Deadline or such later date set by order of the Bankruptcy Court upon the motion of the Wind-Down Administrator without notice and a hearing. Responses and litigation over the allowance of any Claim that is the subject of an objection shall be governed by the Bankruptcy Code, the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court. From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Wind-Down Administrator elects to withdraw such objection or elects to compromise, settle, or otherwise resolve any such objection in its sole and absolute discretion.

(c)    *No Adversary Proceeding.* Notwithstanding anything to the contrary in the Bankruptcy Code or the Bankruptcy Rules, including Bankruptcy Rule 7001, the Liquidating Trustee and the Wind-Down Administrator shall be authorized to initiate, file, or prosecute objections to Allowed Claims, including with respect to the validity, priority, or extent of a Lien or other interest in property, without the commencement of an adversary proceeding.

(d)    *Objections to Claims.* Except as set forth the Plan, no Entity shall have the right to object to any 503(b)(9) Administrative Expense Claims, Other Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims.

2.    No Distributions Pending Allowance. If an objection to a Claim or portion thereof is filed as forth in Section 7.1 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim. Until such time, (a) the Liquidating Trustee may, in its sole and absolute discretion, withhold from the GUC Distributed Funds to be distributed pursuant to the Plan the portion of the GUC Designated Funds allocable to Disputed 503(b)(9) Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed General Unsecured Claims until such Disputed Claims become Allowed, and (b) the Wind-Down Administrator may, in its sole and absolute discretion, withhold from the Wind-Down Funds to be distributed pursuant to the Plan the portion of the Wind-Down Funds allocable to Disputed Other Administrative Expense Claims and Disputed Other Secured Claims.

3.    Estimation. The Liquidating Trustee and the Wind-Down Administrator may, at any time, request that the Bankruptcy Court estimate any Disputed Claim that is a contingent and/or unliquidated Claim that it has authority to object to, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection has been filed to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee or the Wind-Down Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**E.    Summary of Provisions Governing Distributions**

1.    Distributions to Holders of Allowed General Unsecured Claims. The Liquidating Trustee may determine, in its sole and absolute discretion, the timing of any initial, interim, and final distributions to holders of Allowed General Unsecured Claims, taking into account appropriate reserves for Disputed Claims, in accordance with Section 7.2 of the Plan, and may withhold any additional portions of GUC Designated Funds that it determines, in its sole and absolute discretion, should be withheld to cover anticipated Liquidating Trustee Fees, other costs for the administration of the Liquidating Trust Assets, or Statutory Fees.

2.    Calculation of Amounts to Be Distributed. Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Neither Cetero, the Wind-Down Administrator nor the Liquidating Trustee shall have any obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Voting Deadline.

3.    Undeliverable Distributions and Unclaimed Property. In the event that any distribution to any holder of a Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Wind-Down Administrator or the Liquidating Trustee, as applicable, has been provided with sufficient evidence in writing of

11

such Claim holder's new address; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months after the date the Wind-Down Administrator or Liquidating Trustee, as applicable, first attempts a distribution to such holder, in which case such unclaimed property shall be added back to the Wind-Down Funds or the GUC Designated Funds, as applicable.

4.      Minimum Distribution.  Notwithstanding anything to the contrary in the Plan, neither the Wind-Down Administrator nor the Liquidating Trustee shall be required to make a distribution of less than $50.00 to any holder of a Claim unless either a request therefor is made in writing to the Wind-Down Administrator or the Liquidating Trustee, as applicable, by the holder of the Claim with respect to such Claim or the Wind-Down Administrator or the Liquidating Trustee, as applicable, so determines to make such payment in its sole and absolute discretion.

5.      Tax Identification.  Each Entity holding an Allowed Claim is required to provide any information necessary to effect the necessary information reporting and withholding of applicable taxes with respect to distributions to be made under the Plan.  The Wind-Down Administrator or the Liquidating Trustee, as applicable, shall be entitled in its sole discretion to withhold any distributions to a holder of an Allowed Claim that fails to provide tax identification or social security information upon written request.  Notwithstanding any other provision of this Plan, (a) each holder of an Allowed Claim that is to receive a distribution on account thereof pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Wind-Down Administrator or the Liquidating Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Wind-Down Administrator or the Liquidating Trustee, as applicable, in connection with such distribution.  Any property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as unclaimed property pursuant to Section 8.3 of the Plan.

**F.      Bar Dates**

1.      Proofs of Claim.  Pursuant to the Plan, and subject to certain exceptions set forth in the Plan, Entities holding Claims against the Debtors that arose (or are deemed to have arisen) before the Petition Date, including Claims for rejection damages, must file a proof of Claim **on or before the General Bar Date**, which is **45 days after the Effective Date**.  The Plan sets forth in detail the contents and manner of service of any proofs of Claim.

2.      Requests for Payment of Administrative Expense Claim.  Pursuant to the Plan, and except as otherwise provided by separate order of the Bankruptcy Court, any request for payment of Administrative Expense Claim, to the extent such Administrative Expense Claim (a) arose or was incurred on or before the Effective Date and (b) has not been paid, released, or otherwise settled, must be filed and served **on or before the General Bar Date**.  The Plan sets forth in detail the contents and manner of service of any requests for payment of Administrative Expense Claim.

3.      Professional Claims and Committee Claims.  All final requests for payment of Professional Claims and Committee Claims shall be filed with the Bankruptcy Court and served only on: (a) Cetero, Contract Research Solutions, Inc., 2000 Regency Parkway, Suite 255, Cary, North Carolina 27518; (b) counsel to Cetero, Paul Hastings LLP, 191 North Wacker Drive, Thirtieth Floor, Chicago, Illinois 60606, Attn: Marc J. Carmel, Esq., and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary, Esq.; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (re: In re Contract Research Solutions, Inc., et al.); (d) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, Esq., and 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4003, Attn: Shirley S.Cho, Esq.; and (e) counsel to Freeport Financial LLC, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606, Attn: Peter P. Knight, Esq., **on or before the General Bar Date**.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims and Committee Claims shall be determined by the Bankruptcy Court.

**ANY ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM OR REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM BUT FAILS TO DO SO BEFORE THE APPLICABLE BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM OR REQUEST IN ANY MANNER (OR FILING A PROOF OF CLAIM OR REQUEST FOR PAYMENT WITH RESPECT THERETO) AGAINST CETERO, THE ESTATES, THE PURCHASERS, THE WIND-DOWN ADMINISTRATOR, THE LIQUIDATING TRUSTEE, OR ANY OF THE**

12

**FOREGOING ENTITIES' PREDECESSORS, SUCCESSORS, ASSIGNS, AFFILIATES, SUBSIDIARIES, MEMBERS, SHAREHOLDERS, DIRECTORS, OFFICERS, PRINCIPALS, AGENTS, EMPLOYEES, ATTORNEYS, REPRESENTATIVES, ADVISORS, AND OTHER PROFESSIONALS, AND, MOREOVER, CETERO SHALL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS OR LIABILITY WITH RESPECT TO OR ARISING FROM SUCH CLAIM OR REQUEST.**

4.      Procedures for Providing Notice of Bar Dates.  No later than 5 Business Days after the Effective Date, the Liquidating Trustee shall send the notice of Effective Date, substantially in the form included in the Plan Supplement, by first class United States mail, postage prepaid, on all known creditors, equity security holders, and parties in interest.  The Liquidating Trustee shall mail notice of the General Bar Date only to the last known mailing address for each such creditor, equity security holder, or other party in interest.

**G.      Executory Contracts and Unexpired Leases**

1.      Rejection.  Effective on and as of the Effective Date, all Executory Contracts and Unexpired Leases that exist between a Cetero entity and any Entity and that (a) have not previously been assumed, assumed and assigned, or rejected by Cetero, (b) are not subject to a pending motion to assume, assume and assign, or reject as of the Effective Date, (c) are not subject to a notice of rejection pursuant to the Rejection Procedures Order, or (d) are not subject to a notice of assumption and assignment pursuant to the Sale Order, will be deemed rejected pursuant to section 365 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases rejected pursuant to the Plan.

2.      Claims for Rejection Damages.  Proofs of Claim for damages allegedly arising from the rejection pursuant to the Plan or the Confirmation Order of any Executory Contract and Unexpired Lease must be filed and served in accordance with Section 9.1 of the Plan.

**H.      Other Plan Provisions**

1.      Conditions Precedent to the Effective Date.  The following are conditions precedent to the Effective Date of the Plan, unless waived pursuant to Section 12.2 of the Plan:

      i.      the Bankruptcy Court has entered the Confirmation Order, which shall provide that, among other things, the Wind-Down Administrator and the Liquidating Trustee are authorized and directed to take any and all actions necessary or appropriate to consummate the Plan, and such order shall not have been stayed, modified, or vacated on appeal;

      ii.     the Canadian Court has entered an order recognizing the Confirmation Order, and such order shall not have been stayed, modified, or vacated on appeal;

      iii.    the Operations Support Agreement has expired or has been terminated in accordance with its terms or the Purchasers' consent, or the Liquidation Trustee and the Wind-Down Administrator have entered into such further agreements as reasonably required by the Purchasers to satisfy the obligations under the Operations Support Agreement; and

      iv.    all actions, other documents, and agreements necessary to implement the Plan shall have been effected or executed and delivered.

2.      Waiver of Conditions Precedent.  Cetero may waive any of the conditions to the Effective Date set forth in Section 12.1 of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court, and without any formal action other than proceeding to confirm or consummate the Plan.

3.      Effect of Non-Occurrence of Conditions to Consummation.  In the event that one or more of the conditions specified in Section 12.1 of the Plan have not been waived pursuant to Section 12.2 of the Plan or have not occurred on or before 120 days after the Confirmation Date, (a) the Confirmation Order may, upon the request of Cetero, be vacated, (b) no distributions under the Plan shall be made, (c) Cetero and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) Cetero's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against Cetero or any other Person or to prejudice in any manner the rights of Cetero or any Person in any further proceedings involving Cetero.

4.     Restructuring Transactions. After confirmation of the Plan, Cetero or the Wind-Down Administrator may take all actions as may be necessary or appropriate to effect any corporate reorganization or other transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, which may include one or more amendments, amalgamations, restructurings, reorganizations, liquidations, winding-up, dissolutions, transfers, assignments, assumptions, or other transactions as may be determined necessary or appropriate by Cetero (collectively, the "Restructuring Transactions"), including: (1) the execution and delivery of appropriate agreements or other documents of amendment, amalgamation, restructuring, reorganization, liquidation, winding-up, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, including, where appropriate, with respect to the assumption of liabilities upon a transfer or assignment of assets or liquidation or winding-up, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate articles, agreements, certificates and other documents of amendment, amalgamation, restructuring, reorganization, liquidation, winding-up, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that Cetero and the Wind-Down Administrator determine are necessary or appropriate.

5.     Dissolution of the Fully Administered Debtors. Each of the Cetero entities other than CRS (collectively, the "Fully Administered Debtors") (a) shall be liquidated pursuant to the Plan, (b) shall (i) in respect of the U.S. Debtors, be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the applicable Debtor and (ii) in respect of the Canadian Debtors, be dissolved in accordance with applicable laws, and (c) as soon as practicably thereafter shall file with the Secretary of State or other appropriate office for the jurisdiction of its organization the appropriate articles, agreements, certificates, and other documents of cancellation or dissolution. Upon filing of such articles, agreements, certificates, or other documents of cancellation or dissolution, each such Cetero entity immediately shall cease to be, and not continue as, a body corporate or partnership, as applicable, for any purpose whatsoever. Except as otherwise provided hereof or as part of the Restructuring Transactions, each such liquidation and dissolution shall be effective as of the Effective Date pursuant to the Plan and the Confirmation Order.

6.     Final Decree Closing the Chapter 11 Cases of the Fully Administered Debtors. In addition, pursuant to the Plan, Cetero requests entry of a Final Decree, which shall be part of the Confirmation Order, closing the Chapter 11 Cases of the Fully Administered Debtors effective on or after the Effective Date. Specifically, on or after the Effective Date, Cetero's counsel shall file a certification of counsel (the "Certification"), substantially in the form included in the Plan Supplement, (a) certifying that, in accordance with Rule 5009-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware, the Plan has been substantially consummated and all Statutory Fees in respect of the Fully Administered Debtors have been paid and (b) attaching a final report with respect to the Fully Administered Debtors. Upon the filing of the Certification, the Final Decree for the Fully Administered Debtors shall become effective and the Clerk of the Court shall close the Chapter 11 Cases of the Fully Administered Debtors. After the closing of the Chapter 11 Cases of the Fully Administered Debtors, any outstanding motions, contested matters, adversary proceedings, and other unresolved matters in the Chapter 11 Cases shall be administered in the Chapter 11 Case of Reorganized CRS.

7.     Dissolution of Reorganized CRS. Following completion of all actions required by the Wind-Down Administrator pursuant to the Plan, Reorganized CRS shall be liquidated pursuant to the Plan, shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by it, and shall file with the Secretary of State of North Carolina a certificate of dissolution. Upon filing of such certificate of dissolution, Reorganized CRS immediately shall cease to be, and not continue as, a body corporate for any purpose whatsoever.

8.     Closing of Chapter 11 Case of Reorganized CRS. Following completion of all actions required by the Liquidating Trustee pursuant to the Plan, the Liquidating Trustee shall request that the Court enter a Final Decree closing the Chapter 11 Case of Reorganized CRS.

9.     Corporate Action, Authorizations, and Approvals. Each of the matters provided for by the Plan involving the corporate structure of Cetero or corporate or related actions to be taken by or required of Cetero, the Liquidating Trustee, or the Wind-Down Administrator, including the Restructuring Transactions, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken on or prior to the Effective Date, ratified in all respects without further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court, without the need for any further state, federal, provincial, or local regulatory approvals, and without any requirement of further action by the creditors, members, shareholders, directors, officers, managers, or partners of any of the Debtors.

14

10.    Government Approvals Not Required. The Plan and the Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto.

11.    Retention of Jurisdiction. Following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction of the Chapter 11 Cases and all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    hear and determine motions, applications, adversary proceedings, and contested matters pending as of or commenced after the Effective Date;

(b)    hear and determine objections (whether pending as of or filed after the Effective Date) to, or requests for estimation of any Claim, and to enter any order requiring the filing of proof of any Claim before a particular date;

(c)    ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    construe and take any action to enforce the Plan and the Confirmation Order;

(f)    issue such orders as may be necessary for the implementation, execution, and consummation of the Plan and to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Confirmation Order, including the injunction, exculpation, and release provisions contained in Article 11 of the Plan;

(g)    hear and determine all applications for Professional Claims and Committee Claims required by the Plan;

(h)    hear and determine other issues presented or arising under the Plan, including disputes among holders of Claims and arising under agreements, documents, or instruments executed in connection with the Plan;

(i)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)    hear and determine any other matters related hereto and not inconsistent with Chapter 11 of the Bankruptcy Code;

(k)    enter any and all Final Decree of the Debtors;

(l)    hear and determine any action concerning the recovery and liquidation of Estate Assets, wherever located, including litigation to liquidate and recover Estate Assets; and

(m)    to hear and determine any action concerning the determination of taxes, tax refunds, tax attributes, and tax benefits and similar or related matters with respect to Cetero or the Estate including matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

12.    Pre-Confirmation Modification. Upon notice to the U.S. Trustee and the Committee, Cetero may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

13.    Post-Confirmation Immaterial Modification. Cetero, with the approval of the Bankruptcy Court and notice to the U.S. Trustee, the Committee, First Lien Agents, and the Second Lien Agent and without notice to all holders of Claims and Equity Interests, insofar as it does not materially and adversely affect the interest of all holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the consummation of the Plan.

14.    Post-Confirmation Material Modification. The Plan may be altered or amended by Cetero with the consent of the U.S. First Lien Agent and the Committee or the Liquidating Trustee (which consent shall not be unreasonably denied, withheld, or conditioned) after the Confirmation Date but prior to substantial consummation of the Plan in a manner that, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided

15

that such alteration or modification is made as provided in section 1127 of the Bankruptcy Code after notice and a hearing.

15.     Withdrawal or Revocation of the Plan. Cetero reserves the right to seek an order of the Bankruptcy Court revoking or withdrawing the Plan prior to the Effective Date. If the Bankruptcy Court approves the revocation or withdrawal of the Plan, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.

16.     Plan Supplement. Cetero intends to file the initial version of the documents comprising the Plan Supplement on or before ten days prior to the Voting Deadline. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at http://www.deb.uscourts.gov, and at the website of the Claims Agent at http://dm.epiq11.com/crs. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court upon entry of the Confirmation Order.

17.     Release of Liens. Except as otherwise provided in the Plan or the Confirmation Order, all Liens, Claims, charges, or other encumbrances against property of the Debtor or the Estate shall and shall be deemed to be released, cancelled, terminated, and nullified on the Effective Date, without any further action of any Entity, including further orders of the Bankruptcy Court or the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the *Personal Property Security Act* of any of the applicable provinces of Canada, or in accordance with any other real or personal registry system in any of the applicable provinces of Canada.

18.     Payment of Statutory Fees. All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, and that are due by or on the Effective Date shall be paid by the Estate on or before the Effective Date. All such fees that become due after the Effective Date shall be paid by the Liquidating Trustee from the GUC Designated Funds until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

19.     Requests Pursuant to Bankruptcy Rule 2002. After the Effective Date, the Wind-Down Administrator or the Liquidating Trustee may, in their sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Wind-Down Administrator and the Liquidating Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

20.     Dissolution of Committee. The Committee appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code shall be dissolved on the Effective Date, and the Committee shall be relieved of all of its obligations and duties under the Bankruptcy Code.

21.     Claims Agent. Notwithstanding any other document filed in the Chapter 11 Cases to the contrary, 60 days after the Effective Date, the Claims Agent may cease to maintain or provide access to the website maintained by the Claims Agent at http://dm.epiq11.com/crs, provided that a copy of all filed claims be delivered prior to such time to the Liquidating Trustee in electronic format.

## I.    **Effects of Plan Confirmation**

1.     Compromise and Settlement of Claims, Equity Interests, and Controversies. Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of Cetero, its Estates, and the holders of Claims and Equity Interests, and is fair, equitable, and reasonable.

2.     Releases by the Debtors. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtors, including throughout the Chapter 11 Cases and the Canadian

Proceedings, and the implementation of the liquidation contemplated by the Plan (including the Restructuring Transactions), prior to, on, and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors and the Estates from any and all actions, Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that the Debtors or the Estates or each of their respective Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring (including the Restructuring Transactions), the Sale Support Agreement, the Chapter 11 Cases, the Canadian Proceedings, the Global Settlement Agreement, the Sale, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases or the Canadian Proceedings, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Sale Support Agreement, the Global Settlement Agreement, the Asset Purchase Agreement, or related agreements, instruments, or other documents or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence, in each case as determined by Final Order of a court of competent jurisdiction; *provided, however,* that nothing in this Section 11.3 shall release the Purchasers, Cetero, or any of their affiliates from their obligations under the Asset Purchase Agreement or the Operations Support Agreement.

3.    <u>Releases by Holders of Claims</u>.  Except as otherwise set forth in the Plan, on and after the the Effective Date of the Plan, to the fullest extent permitted by applicable law, each holder of a Claim (a) voting to accept the Plan or (b) having an opportunity but not objecting to the release contained in this paragraph shall be deemed to have expressly, unconditionally, irrevocably, generally, and individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Entity (whether individually or collectively) ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring (including the Restructuring Transactions), the Sale Support Agreement, the Chapter 11 Cases, the Canadian Proceedings, the Global Settlement Agreement, the Sale, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases or the Canadian Proceedings, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Sale Support Agreement, the Global Settlement Agreement, the Asset Purchase Agreement, or related agreements, instruments, or other documents or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence in each case as determined by Final Order of a court of competent jurisdiction.

4.    <u>Liabilities to, and Rights of, Governmental Units</u>.  Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (a) any liability to a Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising on or after the Effective Date; (c) any liability to a Governmental Unit on the part of any Entity other than the Debtors; (d) any valid right of setoff or recoupment by a Governmental Unit; or (e) any criminal liability.  Nothing in the Plan or the Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The injunction provisions contained in the Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Effective Date, pursuing any police or regulatory action.

5.    <u>Exculpation</u>.  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action, and liability for any Exculpated Claim, except for gross negligence or willful

17

misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

6.    Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2 AND 11.3 OF THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.5 OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES OR THE PROPERTY OR ESTATES OF THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE RELEASED PARTIES AND THE EXCULPATED PARTIES OR AGAINST THE PROPERTY OR ESTATES OF THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELATED OR SETTLED PURSUANT TO THE PLAN.

## VI.    CONFIRMATION

**A.    Requirements for Confirmation.** Among the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (a) the Plan is accepted by all impaired Classes of Claims, or if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of holders of Claims. A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. Cetero believes that: (a) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (b) Cetero has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

**B.    Acceptances Necessary to Confirm Plan.** Only holders of Claims in Class 3 and Class 4 are entitled to vote on the Plan. All other holders of Claims and Equity Interests are not entitled to vote, either because they are not impaired (Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims) or are impaired but are deemed to reject the Plan (General Unsecured Claims, Intercompany Claims, and Equity Interests). Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance of holders of at least two-thirds in amount and more than one half in number of the claims in that class that actually vote. For the purpose of determining the dollar amount and the number of claims accepting a plan, only those who are entitled to vote and actually vote to accept or reject the plan are counted.

**C.    Confirmation Under Section 1129(b) of the Bankruptcy Code.** Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if all impaired classes entitled to vote have not accepted it, provided that the plan has been accepted by at least one impaired class. Section 1129(b) of the Bankruptcy Code provides that, notwithstanding an impaired class's failure to vote to accept a plan, the plan shall be confirmed, at the

18

plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims requires that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtors or transferred to another Entity under the plan; (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (c) such holders realize the indubitable equivalent of such secured claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan, on account of that equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) if the class does not receive such an amount as required under (a), no class of interests junior to the non-accepting class may receive a distribution under the plan.

Class 5, Class 6, and Class 7 are deemed to have rejected the Plan, and accordingly, Cetero will request that the Court confirm the Plan under section 1129(b) of the Bankruptcy Code. The Cetero reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Cetero submits that if it crams down the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

**D.      Best Interests of Creditors.**  Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in the class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

Included in the Plan Supplement, and incorporated herein by reference, is a liquidation analysis (the "Liquidation Analysis") prepared with the assistance of Carl Marks Advisory Group, LLC ("Carl Marks"), Cetero's restructuring advisor. As reflected in the Liquidation Analysis, Cetero believes that liquidation under chapter 7 of the Bankruptcy Code of Cetero's remaining assets would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. This is so because a chapter 7 liquidation would require the appointment of a trustee, which would require substantial additional expenses and would delay the orderly liquidation of the estates' assets, thereby lowering recoveries to holders of Claims. In addition, a chapter 7 liquidation would also involve the application of the absolute priority rule, which would reduce recoveries to holders of General Unsecured Claims because it would require them, at a minimum, to incur costs to seek the recovery to which they are entitled under the Plan. Consequently, Cetero believes that confirmation of the Plan will provide a substantially greater return to holders of Claims than would liquidation under chapter 7 of the Bankruptcy Code.

E.      **Feasibility.** Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan).

To determine whether the Plan meets this feasibility requirement, Cetero has analyzed the ability of the Liquidating Trustee and the Wind-Down Administrator to meet their respective obligations under the Plan. Cetero believes that there are sufficient assets available in the GUC Designated Funds Account, the Wind-Down Funds Account, and the Carve-Out Funds Account to satisfy distributions required to be made under the Plan, and that, accordingly, the Plan meets the feasibility requirements of the Bankruptcy Code.

## VII.    RISK FACTORS

A.      **Disclosure Statement May Not Be Approved**.  In accordance with the Solicitation Procedures Order, the Bankruptcy Court will consider approval of the Disclosure Statement together with confirmation of the Plan at the Confirmation Hearing.  While Cetero believes that the Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Court and should be approved, there can be no guarantee that the Bankruptcy Court will agree.

B.      **Plan May Not Be Accepted, Confirmed, or Recognized.**  While Cetero believes the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree, nor that the Canadian Court will enter an order recognizing the Confirmation Order.

C.      **Risk of Non-Occurrence of the Effective Date.**  Although Cetero believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether such Effective Date will, in fact, occur.

D.      **Creditors May Object to the Third Party Release.**  Cetero believes that the Third Party Release contained in Section 11.3 of the Plan complies with the requirements of the Bankruptcy Code and applicable law. Nevertheless, there can be no assurance that creditors will not object to the Third Party Release.

## VIII.   TAX CONSEQUENCES

Cetero has not requested a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the tax consequences of the Plan.  Each holder of a Claim and Equity Interest should consult their own tax advisor as to the specific tax consequences to such entity of any term of the Plan, including the application and effect of federal, state, provincial, and local income and other tax laws, before determining whether to accept or reject the Plan.

## IX.     CONCLUSION AND RECOMMENDATION

In the opinion of Cetero, the Plan is preferable to all other available alternatives and provides for a larger distribution to Cetero's creditors than would otherwise result in any other scenario.  Accordingly, Cetero, the First Lien Agents, and the Second Lien Agent recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support confirmation of the Plan.

*[Remainder of page intentionally left blank.]*

Dated:  July 16, 2012

Respectfully submitted,

ALLIED RESEARCH HOLDINGS INC.
ALLIED RESEARCH INTERNATIONAL, INC. (FLORIDA)
ALLIED RESEARCH INTERNATIONAL INC. (ONTARIO)
ALLIED RESEARCH INTERNATIONAL INDIA, LLC
ALLIED RESEARCH INTERNATIONAL U.S., LLC
BA RESEARCH CO.
BA RESEARCH INTERNATIONAL HOLDINGS, LLC
BA RESEARCH INTERNATIONAL, L.P.
BARI MANAGEMENT, LLC
BARI MERGER SUB, LLC
BARI PARTNERS, G.P.
BIOASSAY RESEARCH CO.
CONTRACT RESEARCH SOLUTIONS, INC.
CRS MANAGEMENT, INC.
CRS REAL ESTATE HOLDINGS LLC
DIABETES AND GLANDULAR DISEASE RESEARCH
    ASSOCIATES, INC.
GATEWAY MEDICAL RESEARCH, INC.
PRACS DERMATOLOGY, LLC
PRACS INSTITUTE, LTD.
SPECIALTY RESEARCH, INC.

By: _____
Name:   Michael T. Murren
Title:   President, Chief Financial Officer, Treasurer, and Secretary


**PAUL HASTINGS LLP**
Luc A. Despins
G. Alex Bongartz
Sung Ho Choi
Park Avenue Tower
75 East 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000

Marc J. Carmel
Christian M. Auty
191 North Wacker Drive, Thirtieth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600

*Counsel to the Debtors and Debtors in Possession*