**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-----------------------------------------------------------------------x
                                                :

*In re:*                                     :      Chapter 11
                                                  :

**CONTRACT RESEARCH SOLUTIONS, INC.,** *et al.*,     :      **Case No. 12-11004 (KJC)**
                                                  :

         Debtors.[1]                              :      **Jointly Administered**
                                                    :
-----------------------------------------------------------------------x

**AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF**
**CONTRACT RESEARCH SOLUTIONS, INC.,** *ET AL.*

Dated:          Wilmington, Delaware
                 September 6, 2012

**PAUL HASTINGS LLP**
Luc A. Despins
G. Alex Bongartz
Sung Ho Choi
Park Avenue Tower
75 East 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000

Marc J. Carmel
Christian M. Auty
191 North Wacker Drive, Thirtieth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600

*Counsel to the Debtors and Debtors in Possession*

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Contract Research Solutions, Inc. (3750); Allied Research Holdings Inc. (not applicable); Allied Research International Inc. (Ontario) (not applicable); Allied Research International, Inc. (Florida) (6246); Allied Research International India, LLC (not applicable); Allied Research International U.S., LLC (not applicable); BA Research Co. (not applicable); BA Research International Holdings, LLC (not applicable); BA Research International, L.P. (0418); BARI Management, LLC (not applicable); BARI Merger Sub, LLC (not applicable); BARI Partners, G.P. (0418); Bioassay Research Co. (5944); CRS Management, Inc. (2856); CRS Real Estate Holdings LLC (not applicable); Diabetes and Glandular Disease Research Associates, Inc. (1817); Gateway Medical Research, Inc. (0344); PRACS Dermatology, LLC (not applicable); PRACS Institute, Ltd. (7073); Specialty Research, Inc. (5373).  Cetero's corporate address is P.O. Box #219, 3201-141 Edwards Mill Road, Raleigh, North Carolina 27612.

**TABLE OF CONTENTS**

**Page**

ARTICLE 1     DEFINITIONS AND INTERPRETATION ................................................. 1

    1.1    Rules of Interpretation ................................................................................ 1

    1.2    Definitions ................................................................................................... 1

ARTICLE 2     ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ........................... 8

    2.1    Allowed Administrative Expense Claims ..................................................... 8

    2.2    Treatment of Allowed Priority Tax Claims ................................................. 9

ARTICLE 3     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................................ 9

    3.1    Classification of Claims and Equity Interests .............................................. 9

    3.2    Summary of Classification .......................................................................... 9

    3.3    Impairment Controversies ........................................................................ 10

ARTICLE 4     TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS ................ 10

    4.1    Class 1 – Allowed Priority Non-Tax Claims ............................................ 10

    4.2    Class 2 – Allowed Other Secured Claims ................................................. 10

    4.3    Class 3 – Allowed First Lien Claims ........................................................ 11

    4.4    Class 4 –Allowed Second Lien Claims ..................................................... 11

    4.5    Class 5 – General Unsecured Claims ........................................................ 12

    4.6    Class 6 – Intercompany Claims ................................................................ 12

    4.7    Class 7 – Equity Interests ......................................................................... 12

    4.8    KRG Entities' Claim Waiver .................................................................... 12

    4.9    Reservation of Rights ................................................................................ 12

    4.10   Subordination of Deficiency Claims ......................................................... 12

ARTICLE 5     ACCEPTANCE OR REJECTION OF PLAN; CRAMDOWN .......................... 13

    5.1    Classes and Claims Entitled to Vote ......................................................... 13

    5.2    Acceptance by a Class of Creditors ........................................................... 13

    5.3    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................ 13

ARTICLE 6     MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 13

    6.1    Liquidating Trust ....................................................................................... 13

    6.2    Reorganized CRS ...................................................................................... 14

    6.3    Record Sharing .......................................................................................... 15

    6.4    Restructuring Transactions ......................................................................... 15

    6.5    Corporate Existence and Final Decrees Closing the Chapter 11 Cases ...... 16

    6.6    Corporate Action, Authorizations, and Approvals .................................... 16

    6.7    Government Approvals Not Required ........................................................ 17

ARTICLE 7     PROCEDURES FOR DISPUTED CLAIMS .................................................... 17

    7.1    Objections to Claims and Resolution of Disputed Claims ........................ 17

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 7.2 | No Distributions Pending Allowance | 17 |
| 7.3 | Estimation | 18 |
| ARTICLE 8 | PROVISION GOVERNING DISTRIBUTIONS | 18 |
| 8.1 | Distributions to Holders of Allowed General Unsecured Claims | 18 |
| 8.2 | Calculation of Amounts to Be Distributed | 18 |
| 8.3 | Undeliverable Distributions and Unclaimed Property | 18 |
| 8.4 | Minimum Distribution | 18 |
| 8.5 | Tax Identification | 18 |
| ARTICLE 9 | BAR DATES | 18 |
| 9.1 | Proofs of Claim | 18 |
| 9.2 | Requests for Payment of Administrative Expense Claim | 20 |
| 9.3 | Procedures for Providing Notice of Bar Dates | 20 |
| 9.4 | Failure to File a Timely Proof of Claim or Request Payment of Administrative Expense Claim | 20 |
| ARTICLE 10 | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 21 |
| 10.1 | Rejection | 21 |
| 10.2 | Claims for Rejection Damages | 21 |
| ARTICLE 11 | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | 21 |
| 11.1 | Compromise and Settlement of Claims, Equity Interests, and Controversies | 21 |
| 11.2 | Releases by the Debtors | 21 |
| 11.3 | Releases by Holders of Claims | 22 |
| 11.4 | Liabilities to, and Rights of, Governmental Units | 22 |
| 11.5 | Exculpation | 22 |
| 11.6 | Injunction | 22 |
| ARTICLE 12 | CONDITIONS PRECEDENT | 23 |
| 12.1 | Conditions Precedent to the Effective Date | 23 |
| 12.2 | Waiver of Conditions Precedent | 23 |
| 12.3 | Effect of Non-Occurrence of Conditions to Consummation | 23 |
| ARTICLE 13 | RETENTION OF JURISDICTION | 23 |
| ARTICLE 14 | MISCELLANEOUS PROVISIONS | 24 |
| 14.1 | Pre-Confirmation Modification | 24 |
| 14.2 | Post-Confirmation Immaterial Modification | 24 |
| 14.3 | Post-Confirmation Material Modification | 24 |
| 14.4 | Withdrawal or Revocation of the Plan | 24 |
| 14.5 | Plan Supplement | 24 |

**TABLE OF CONTENTS**
(continued)

**Page**

14.6      Release of Liens ................................................................................................................ 24

14.7      Payment of Statutory Fees ................................................................................................ 25

14.8      Requests Pursuant to Bankruptcy Rule 2002 ................................................................... 25

14.9      No Admissions .................................................................................................................. 25

14.10    Plan Controls .................................................................................................................... 25

14.11    Governing Law ................................................................................................................. 25

14.12    Substantial Consummation of Plan ................................................................................... 25

14.13    Binding Effect ................................................................................................................... 25

14.14    Severability ....................................................................................................................... 25

14.15    Notices and Distributions .................................................................................................. 25

14.16    Withholding and Reporting ............................................................................................... 26

14.17    Other Documents and Actions .......................................................................................... 26

14.18    Allocation of Plan Distributions ....................................................................................... 26

14.19    Dissolution of Committee ................................................................................................. 26

14.20    Claims Agent ..................................................................................................................... 26

**INTRODUCTION**

Contract Research Solutions, Inc. and its affiliated debtors in the above-captioned chapter 11 cases (collectively, "Cetero") jointly propose the following Plan.  Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of Cetero's history, business, properties and operations, risk factors, a summary and analysis of the Plan, and certain related matters.  Subject to Sections 14.1, 14.2, and 14.3 hereof and in accordance with certain restrictions and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, Cetero reserves the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

**ARTICLE 1 – DEFINITIONS AND INTERPRETATION**

1.1    **Rules of Interpretation.**  Unless otherwise specified, all Section, Article, and Exhibit references in the Plan are to the respective Section in, Article of, or Exhibit to the Plan, as the same may be amended, waived, or modified from time to time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Words denoting the singular number shall include the plural number and vice versa, unless the context requires otherwise.  Pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole, and not to any particular section, subsection, or clause contained in the Plan.  In construing the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.2    **Definitions.**  Terms and phrases, whether capitalized or not, that are used and not defined in the Plan, but that are defined in the Bankruptcy Code or Bankruptcy Rules, have the meanings ascribed to them in the Bankruptcy Code or Bankruptcy Rules, as applicable.  Unless otherwise provided in the Plan, the following terms have the respective meanings set forth below, and such meanings shall be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires.

1.2.1    "503(b)(9) Administrative Expense Claim" means an Administrative Expense Claim allowed under section 503(b)(9) of the Bankruptcy Code.

1.2.2    "Administrative Expense Claim" means a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under sections 503(b) or 507(a)(2) of the Bankruptcy Code.  Administrative Expense Claims shall include Professional Claims, Committee Claims, and all Claims, if any, that are entitled to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code and all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

1.2.3    "Allowed" means, with reference to any Claim, (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by Cetero from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent or unknown and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or timely filed proof of Claim, as to which no objection to allowance has been interposed in accordance with the Plan by the Claims Objection Deadline or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, or (d) with respect to any General Unsecured Claim, any General Unsecured Claim that the Liquidating Trustee agrees to allow in its sole and absolute discretion.

1.2.4    "Amended Schedules Bar Date" means the date set forth in Section 9.1.4 hereof.

1.2.5    "Asset Purchase Agreement" means the Asset Purchase Agreement by and among Cetero and the Purchasers, dated as of March 25, 2012 (collectively with all related agreements, amendments, documents or instruments, and all exhibits, schedules and addenda to any of the foregoing), as approved by the Sale Order.

1.2.6    "Ballot" means a ballot, in the form approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject the Plan, on which such holder may vote to accept or reject the Plan.

1.2.7    "Bankruptcy Code" means Title 11 of the United States Code, sections 101–1532, as now in effect or as hereafter amended.

1.2.8    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

1.2.9    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended and promulgated under section 2075 of Title 28 of the United States Code, together with (a) the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware as now in effect or as the same may from time to time hereafter be amended and (b) the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.

1.2.10    "Bar Date" means the General Bar Date and the Amended Schedules Bar Date, as applicable.

1.2.11    "Building Loan Notes" means the promissory notes issued by certain of the Debtors to certain KRG Entities, dated January 22, 2009 (as amended, supplemented, modified, or amended and restated from time to time).

1.2.12    "Business Day" means any day that is not a Saturday, Sunday, or "legal holiday" within the meaning of Bankruptcy Rule 9006(a).

1.2.13    "Canadian First Lien Agent" means Bank of Montreal, or its successor, in its capacity as the Canadian agent under the First Lien Loan Documents.

1.2.14    "Canadian Court" means the Ontario Superior Court of Justice (Commercial List).

1.2.15    "Canadian Debtors" means Allied Research Holdings Inc., Allied Research International Inc. (Ontario), and BA Research Co., or any successors thereof pursuant to the Restructuring Transactions.

1.2.16    "Canadian Proceedings" means the recognition proceedings (Court File No.: CV-12-9663-00CL) commenced on March 30, 2012, before the Canadian Court by CRS, as foreign representative on behalf of the Debtors, pursuant to Part IV of the CCAA, to, among other things, recognize the jointly administered Chapter 11 Cases as "foreign main proceedings."

1.2.17    "Carve-Out Funds" means the funds in the Carve-Out Funds Account, which was funded upon closing of the Sale in accordance with the Final DIP Order.

1.2.18    "Carve-Out Funds Account" means the segregated account in which the Carve-Out Funds are held for the benefit of holders of Allowed Professional Claims that arose prior to the closing of the Sale.

1.2.19    "Cash" means lawful currency of the United States and its equivalents; *provided*, *however*, that any distributions by Cetero, the Wind-Down Administrator, or the Liquidating Trustee under the Plan will be deemed to be made in Cash if made by check drawn on any United States bank.

1.2.20    "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim, or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim or cause of action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.2.21    "CCAA" means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c.C-36, as amended.

1.2.22    "Cetero" means, collectively, Allied Research Holdings Inc., Allied Research International, Inc. (Florida), Allied Research International Inc. (Ontario), Allied Research International India, LLC, Allied Research International U.S., LLC, BA Research Co., BA Research International Holdings, LLC, BA Research International, L.P., BARI Management, LLC, BARI Merger Sub, LLC, BARI Partners, G.P., Bioassay Research Co., Contract Research Solutions, Inc., CRS Management, Inc., CRS Real Estate Holdings LLC, Diabetes and Glandular Disease Research Associates, Inc., Gateway Medical Research, Inc., PRACS Dermatology, LLC, PRACS Institute, Ltd., and Specialty Research, Inc., or any successors thereof pursuant to the Restructuring Transactions.

1.2.23    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 12-11004 (KJC).

1.2.24   "Claim" means a claim against a Cetero entity or its property, as such term is defined in section 101(5) of the Bankruptcy Code.

1.2.25   "Claims Agent" means Epiq Bankruptcy Solutions, LLC, retained by the Debtors as notice and claims agent by orders of the Bankruptcy Court, (a) dated March 27, 2012, entitled *Order, Pursuant to Section 156(c) of Title 28 of the United States Code, Bankruptcy Code Section 105(a), and Local Rule 2002-1(f), Authorizing Cetero to Retain and Employ Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent, Nunc Pro Tunc to the Petition Date* [Docket No. 35], and (b) dated April 24, 2012, entitled *Order, Pursuant to Sections 327(a), 330 and 331, Bankruptcy Rules 2014 and 2016, and Local Rule 2014-1, Authorizing Cetero to Retain and Employ Epiq Bankruptcy Solutions, LLC as Administrative Advisor, Nunc Pro Tunc to Petition Date* [Docket No. 175].

1.2.26   "Class" means one of the categories of Claims or Equity Interests established under Article 3 of the Plan in accordance with sections 1122 and 1123(a) of the Bankruptcy Code.

1.2.27   "Claims Objection Deadline" means 180 days after the Effective Date or such other further date as the Bankruptcy Court may set by order.

1.2.28   "Committee" means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee for the District of Delaware on April 5, 2012 in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as the composition of such Committee may be altered from time to time.

1.2.29   "Committee Claim" means (a) a Claim by a Committee Professional for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases, or (b) a Claim by any Committee Member that is asserted as an Administrative Expense Claim.

1.2.30   "Committee Member" means a member of the Committee, in its capacity as such.

1.2.31   "Committee Professional" means a Professional employed and retained by the Committee.

1.2.32   "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.2.33   "Confirmation Hearing" means the hearing(s) before the Bankruptcy Court in accordance with section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing(s) may be delayed, continued, or rescheduled.

1.2.34   "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

1.2.35   "Creditor" means any Entity that has a Claim against a Cetero entity that arose at the time of or before the Petition Date.

1.2.36   "CRS" means Contract Research Solutions, Inc.

1.2.37   "Debtors" means, collectively, Allied Research Holdings Inc., Allied Research International, Inc. (Florida), Allied Research International Inc. (Ontario), Allied Research International India, LLC, Allied Research International U.S., LLC, BA Research Co., BA Research International Holdings, LLC, BA Research International, L.P., BARI Management, LLC, BARI Merger Sub, LLC, BARI Partners, G.P., Bioassay Research Co., Contract Research Solutions, Inc., CRS Management, Inc., CRS Real Estate Holdings LLC, Diabetes and Glandular Disease Research Associates, Inc., Gateway Medical Research, Inc., PRACS Dermatology, LLC, PRACS Institute, Ltd., and Specialty Research, Inc., or any successors thereof pursuant to the Restructuring Transactions.

1.2.38   "Debtors-in-Possession" means, collectively, the Cetero entities operating in their respective capacities as debtors-in-possession pursuant to Chapter 11 of the Bankruptcy Code.

1.2.39   "DIP Secured Parties" has the meaning set forth in the Final DIP Order.

1.2.40   "Disallowed Claim" means a Claim or portion thereof that (a) has been disallowed by a Final Order, (b) is identified in the Schedules in the amount of zero dollars or as contingent, unliquidated, or disputed and as to which a proof of Claim was not filed on or before the applicable Bar Date, (c) is not identified in the Schedules and as to which no proof of Claim has been filed or deemed filed on or before the applicable Bar Date, as applicable, (d) was not filed in a timely manner as provided by the Plan, the Confirmation Order, or other relevant order of the Bankruptcy Court, or (e) is not an Allowed Claim.

3

1.2.41   "<u>Disclosure Statement</u>" means the disclosure statement with respect to the Plan, approved by the Bankruptcy Court as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of the Plan, as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

1.2.42   "<u>Disputed</u>" means any Claim or any portion thereof that is not a Disallowed Claim and that is (a) a proof of Claim that was filed and for which no amount was listed in the Schedules, (b) a proof of Claim that was filed in an amount or priority that is greater than was listed in the Schedules, (c) a proof of Claim that was filed and is contingent and/or unliquidated, (d) a proof of Claim that was filed and is a duplicate of another proof of Claim, (e) a proof of Claim that was filed and that amends a prior filed proof of Claim, or (f) a proof of Claim that was filed and that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, subordinate, or estimate such Claim.

1.2.43   "<u>Effective Date</u>" means as soon as practicable after the date on which the conditions specified in Section 12.1 hereof have been satisfied or waived in writing by Cetero.

1.2.44   "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.2.45   "<u>Equity Interest</u>" means any ownership interest or share in any of the Cetero entities (including all options, warrants, or other rights to obtain such an interest or share in the Cetero entities) whether or not transferable, preferred, common, voting, or denominated as "stock" or a similar security.

1.2.46   "<u>Estate(s)</u>" means, individually, the estate created for each of the Debtors and, collectively, the estates created for all the Debtors pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.2.47   "<u>Estate Assets</u>" means the respective assets of the Debtors and their Estates as of the Effective Date, including any and all proceeds, rents, products, offspring, and profits arising from or generated by such property after the Effective Date.

1.2.48   "<u>Executory Contracts and Unexpired Leases</u>" means, collectively, "executory contracts" and "unexpired leases" of the Debtors as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code; *provided*, *however*, that "Executory Contract and Unexpired Leases" excludes the Asset Purchase Agreement and the Sale Support Agreement.

1.2.49   "<u>Exculpated Claim</u>" means any Claim related to (a) any prepetition act or omission derived from, based upon, related to, or arising from the Sale Support Agreement and the documents related thereto, the Chapter 11 Cases, and the Canadian Proceedings, and (b) any postpetition act or omission derived from, based upon, related to, or arising from Cetero's in or out-of-court restructuring efforts, the Chapter 11 Cases, the Canadian Proceedings, the Global Settlement Agreement, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the Canadian Proceedings, the pursuit of consummation, administration, and implementation of the Plan (including the recognition thereof in the Canadian Proceedings), and any other agreement entered into in connection with or contemplation of the restructuring or sale of Cetero, including (a) the Sale Support Agreement and (b) the distribution of property under the Plan or any other agreement.

1.2.50   "<u>Exculpated Party</u>" means each of the following in its capacity as such: (a) the Debtors; (b) the Committee; (c) the Committee Members; (d) the Information Officer; (e) the Liquidating Trustee; (f) the Wind-Down Administrator; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entity's predecessors, successors, assigns, affiliates, subsidiaries, members, shareholders, directors, officers, principals, agents, employees, attorneys, representatives, advisors, and other professionals.

1.2.51   "<u>Final Decree</u>" means the decree contemplated under Bankruptcy Rule 3022.

1.2.52   "<u>Final DIP Budget</u>" means the Budget set forth on Exhibit A to the Final DIP Order (as such budget may be subsequently amended, restated, or otherwise modified in accordance with the Final DIP Order and the Global Settlement Agreement).

1.2.53   "<u>Final DIP Order</u>" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364*, dated May 9, 2012 [Docket No. 251].

1.2.54    "Final Order" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court, the Canadian Court, or by any state, provincial, or other federal court or other tribunal having jurisdiction over the subject matter thereof, which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for review, rehearing, or certiorari or move for reargument has expired or shall have been waived in writing in form and substance satisfactory to Cetero and as to which no appeal or petition for review, rehearing, or certiorari or motion for reargument is pending; or (b) any appeal or petition for review, rehearing, certiorari, or reargument has been finally decided and no further appeal or petition for review, rehearing, certiorari, or reargument can be taken or granted; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.2.55    "Final Wind-Down Budget" means the Wind-Down Budget, set forth on Exhibit B to the Final DIP Order (as such budget may be subsequently amended, restated, or otherwise modified in accordance with the Final DIP Order and the Global Settlement Agreement).

1.2.56    "First Lien Agents" means the U.S. First Lien Agent and the Canadian First Lien Agent.

1.2.57    "First Lien Claim" means any Claim derived from, based upon, relating to, or arising from the First Lien Loan Documents.

1.2.58    "First Lien Credit Agreement" means that certain Third Amended and Restated Credit Agreement, dated as of March 14, 2007, as amended, supplemented, modified, or amended and restated from time to time, by and among PRACS Institute, Ltd., as U.S. borrower, Allied Research Holdings Inc., as Canadian borrower, the First Lien Agents, and the First Lien Lenders.

1.2.59    "First Lien Loan Documents" means, collectively, the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), in each case as amended, restated, supplemented, or otherwise modified from time to time.

1.2.60    "First Lien Credit Facility" means the credit facility contemplated in the First Lien Credit Agreement.

1.2.61    "First Lien Lenders" means the lenders from time to time party to the First Lien Credit Agreement.

1.2.62    "First Lien Secured Parties" means, collectively, the First Lien Lenders, the First Lien Agents, any other documentation agent, co-agent, and other agents for the First Lien Lenders in respect of the First Lien Credit Facility and any other Entity to which any Obligations (as defined in the First Lien Credit Agreement) or any other amounts are owed by any Debtor under the First Lien Loan Documents in any capacity.

1.2.63    "Fully Administered Debtors" has the meaning set forth in Section 6.5.2 hereof.

1.2.64    "General Bar Date" means the date that is 45 days after the Effective Date, at 4:00 p.m. (prevailing Eastern Time), as set forth in Section 9.1 hereof.

1.2.65    "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a First Lien Claim, a Second Lien Claim, an Intercompany Claim, or an Equity Interest.

1.2.66    "Global Settlement Agreement" means the Settlement Agreement by and among, among others, Cetero, the First Lien Agents, certain of the First Lien Lenders, the Second Lien Agent, certain of the Second Lien Lenders, and the Committee, dated as of April 30, 2012, as approved by the Court pursuant to the Global Settlement Approval Order.

1.2.67    "Global Settlement Approval Order" means the *Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Terms of, and Authorizing Cetero to Enter into, Gobal Settlement Agreement*, dated May 11, 2012 [Docket No. 258].

1.2.68    "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.2.69    "GUC Designated Funds" means the funds in the GUC Designated Funds Account, which was funded upon the closing of the Sale in accordance with the Global Settlement Agreement.

1.2.70    "GUC Designated Funds Account" means a segregated account at a financial institution designated by the Committee in which the GUC Designated Funds are held for the benefit of the Liquidating Trust Beneficiaries; *provided, however*, that the GUC Designated Funds may be used, at the discretion of the Liquidating Trustee, as the

Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

1.2.71    "Information Officer" means PricewaterhouseCoopers Inc., in its capacity as the court-appointed officer in connection with the Canadian Proceedings.

1.2.72    "Intercompany Claims" means any Claim held by a Debtor against another Debtor.

1.2.73    "KRG Entities" means, collectively, KRG Capital Fund III, L.P., KRG Capital Fund III (FF), L.P., KRG Capital Fund III (PA), L.P., and KRG Co-Investment, LLC and any of their Affiliates (as defined in the First Lien Credit Agreement).

1.2.74    "Liens" means a lien as defined in section 101(37) of the Bankruptcy Code.

1.2.75    "Liquidating Trust" means that certain trust established pursuant to the terms of the Plan and the Liquidating Trust Agreement, as described in Section 6.1 hereof.

1.2.76    "Liquidating Trust Agreement" means that certain agreement, in form and substance acceptable to Cetero and the Committee, setting forth the terms and conditions governing the Liquidating Trust, which shall be included in the Plan Supplement.

1.2.77    "Liquidating Trust Assets" means (a) the GUC Designated Funds, (b) all defenses, offsets, rights of recoupment, rights of disallowance, recharacterization, and/or equitable subordination of Cetero and the Estates with respect to the Liquidating Trust Beneficiaries, and (c) all rights of the Liquidating Trust arising from the Plan itself.

1.2.78    "Liquidating Trust Beneficiaries" means the holders of Allowed 503(b)(9) Administrative Expense Claims, Allowed Committee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims.

1.2.79    "Liquidating Trustee" means the Entity appointed by the Committee, and provided in the Plan Supplement, to administer the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

1.2.80    "Liquidating Trustee Fees" means any reasonable fees and out-of-pocket expenses incurred by the Liquidating Trustee in accordance with the Liquidating Trust Agreement and Section 6.2.7 hereof, including fees and expenses of professionals that may be retained by the Liquidating Trustee.

1.2.81    "Net GUC Designated Funds" means the amount of GUC Designated Funds remaining, if any, after payment of all: (a) Allowed 503(b)(9) Administrative Expense Claims; (b) Allowed Committee Claims; (c) Allowed Priority Tax Claims; (d) Allowed Priority Non-Tax Claims; (e) Liquidating Trustee Fees and any other costs incurred by the Liquidating Trust; and (f) Statutory Fees incurred post-Effective Date.

1.2.82    "Operations Support Agreement" has the meaning set forth in the Asset Purchase Agreement.

1.2.83    "Other Administrative Expense Claims" means any Administrative Expense Claim that is not (a) a 503(b)(9) Administrative Expense Claim, (b) a Professional Claim, or (c) a Committee Claim.

1.2.84    "Other Secured Claim" means any Secured Claim that is not (a) a First Lien Lender Claim or (b) a Second Lien Lender Claim.

1.2.85    "Petition Date" means March 26, 2012.

1.2.86    "Plan" means this joint liquidating chapter 11 plan (including all exhibits annexed hereto and the Plan Supplement), as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and Sections 14.1, 14.2, and 14.3 hereof.

1.2.87    "Plan Supplement" means the collection of Plan-related documents to be filed with the Court, which may consist of one or multiple filings.

1.2.88    "Priority Non-Tax Claim" means a Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.2.89    "Priority Tax Claim" means a Claim entitled to priority in right of payment under section 502(i) or section 507(a)(8) of the Bankruptcy Code.

1.2.90    "Pro Rata Share" means, with respect to any distribution to a Class under the Plan, proportionate sharing pursuant to which the ratio of the cumulative amount of all funds distributed on account of an Allowed Claim to the

amount of such Allowed Claim is the same as the ratio of the cumulative amount distributed to such Class to the total amount of all Allowed Claims and Disputed Claims classified into such Class.

1.2.91    "Professional" means any Entity employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

1.2.92    "Professional Claim" means a Claim by a Professional for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases, other than a Committee Claim.

1.2.93    "Purchasers" means, collectively, PRACS Institute Holdings, LLC (f/k/a CRSI Holdings, LLC), PRACS Institute Canada B.C. LTD. (f/k/a 0935867 B.C. Ltd.), and 0935870 B.C. Ltd.  For the avoidance of doubt, none of the Purchasers is a successor to any of the Cetero entities.

1.2.94    "Record Date" means July 16, 2012.

1.2.95    "Released Party" means each of the following in its capacity as such: (a) the Debtors; (b) the First Lien Secured Parties; (c) the Second Lien Secured Parties; (d) the DIP Secured Parties; (e) the Purchasers; (f) the Committee; (g) the Committee Members; (h) the Information Officer; (i) the Liquidating Trustee; (j) the Wind-Down Administrator; (k) the KRG Entities; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), such Entity's predecessors, successors, assigns, affiliates, subsidiaries, members, shareholders, directors, officers, principals, agents, employees, attorneys, representatives, advisors, and other professionals; *provided, however,* that for the avoidance of doubt, nothing in this Plan shall be deemed to release the Purchasers, Cetero, or any of their affiliates from their obligations under the Asset Purchase Agreement or the Operations Support Agreement.

1.2.96    "Rejection Procedures Order" means the *Order, Pursuant to Section 105, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 6006 and 6007, Approving Expedited Procedures for (A) Rejection of Executory Contracts and Unexpired Leases and (B) Abandonment of Personal Property*, dated May 17, 2012 [Docket No. 343].

1.2.97    "Reorganized CRS" means CRS on and after the Effective Date.

1.2.98    "Restructuring Transactions" has the meaning set forth in Section 6.4 hereof.

1.2.99    "Sale" means the sale pursuant to the Asset Purchase Agreement, as approved by the Court pursuant to the Sale Order.

1.2.100    "Sale Order" means the *Order Authorizing (A) the Sale of Certain Assets of the Debtors Free and Clear of all Claims, Liens, Liabilities, Rights, Equity Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents; (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (D) Granted Related Relief*, dated May 17, 2012 [Docket No. 345].

1.2.101    "Sale Support Agreement" means the Sale Support Agreement by and among Cetero, the First Lien Agents, the Second Lien Agent, certain of the First Lien Lenders and Second Lien Lenders, dated as of March 23, 2012, a copy of which is attached as Exhibit 2 to the *Declaration of Michael T. Murren in Support of Cetero's First-Day Motions* [Docket No. 2].

1.2.102    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by Cetero with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

1.2.103    "Second Lien Agent" means Freeport Financial LLC, or its successor, in its capacity as the agent under the Second Lien Loan Documents.

1.2.104    "Second Lien Claim" means any Claim derived from, based upon, relating to, or arising from the Second Lien Loan Documents.

1.2.105    "Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of October 17, 2006, as amended, supplemented, modified, or amended and restated from time to time, by and among PRACS Institute, Ltd., as borrower, the Second Lien Agent, and the Second Lien Lenders.

1.2.106  "Second Lien Loan Documents" means, collectively, the Second Lien Credit Agreement and the other Loan Documents (as defined in the Second Lien Credit Agreement), in each case as amended, restated, supplemented, or otherwise modified from time to time.

1.2.107  "Second Lien Credit Facility" means the credit facility contemplated in the Second Lien Loan Documents.

1.2.108  "Second Lien Lenders" means the lenders from time to time party to the Second Lien Credit Agreement.

1.2.109  "Second Lien Secured Parties" means, collectively, the Second Lien Lenders, the Second Lien Agent, any other documentation agent, co-agent, and other agents for the Second Lien Lenders in respect of the Second Lien Credit Facility and any Entity to which any Obligations (as defined in the Second Lien Credit Agreement) or any other amounts are owed by any Debtor under the Second Lien Loan Documents in whatever capacity.

1.2.110  "Secured Claim" means a Claim that is secured (a) by a Lien that is valid, perfected, and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of a Final Order or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to such setoff, as applicable.

1.2.111  "Security" means a security as defined in section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. §§ 771-7711 (together with the rules and regulations promulgated thereunder).

1.2.112  "Statutory Fees" means all fees payable pursuant to section 1930 of Title 28 of the United States Code, in accordance with Section 14.7 hereof.

1.2.113  "Surplus Wind-Down Funds" means the Wind-Down Funds remaining in the Wind-Down Funds Account after full payment of all Allowed Other Administrative Expense Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Wind-Down Administrator Fees, and any costs incurred for the administration of the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget.

1.2.114  "U.S. Debtors" means Allied Research International, Inc. (Florida), Allied Research International India, LLC, Allied Research International U.S., LLC, BA Research International Holdings, LLC, BA Research International, L.P., BARI Management, LLC, BARI Merger Sub, LLC, BARI Partners, G.P., Bioassay Research Co., Contract Research Solutions, Inc., CRS Management, Inc., CRS Real Estate Holdings LLC, Diabetes and Glandular Disease Research Associates, Inc., Gateway Medical Research, Inc., PRACS Dermatology, LLC, PRACS Institute, Ltd., and Specialty Research, Inc., or any successors thereof pursuant to the Restructuring Transactions.

1.2.115  "U.S. First Lien Agent" means Freeport Financial LLC, or its successor, in its capacity as the U.S. agent under the First Lien Loan Documents.

1.2.116  "Voting Deadline" means August 24, 2012, which is the deadline set by the Bankruptcy Court for parties to submit their ballots to accept or reject the Plan.

1.2.117  "Wind-Down Administrator" means the Entity designated by Cetero in the Plan Supplement to make or facilitate distributions from the Wind-Down Funds and the Carve-Out Funds in accordance with the Plan.

1.2.118  "Wind-Down Administrator Fees" means any reasonable fees and out-of-pocket expenses incurred by the Wind-Down Administrator in accordance with Section 6.2.7 hereof, including fees and expenses of professionals that may be retained by the Wind-Down Administrator.

1.2.119  "Wind-Down Funds" means the funds in the Wind-Down Funds Account, which was funded upon the closing of the Sale as contemplated by the Final DIP Order and the Sale Order.

1.2.120  "Wind-Down Funds Account" means the segregated account in which the Wind-Down Funds are held for the benefit of holders of Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, and Allowed First Lien Claims.

### ARTICLE 2 – ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1  **Allowed Administrative Expense Claims.**  Each holder of an Allowed Administrative Expense Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim: (a) the unpaid amount of such Allowed Administrative Expense Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Administrative Expense Claim; or

(b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee (in the case of Allowed 503(b)(9) Administrative Expense Claims) or the Wind-Down Administrator (in the case of Allowed Other Administrative Expense Claims).

2.1.1    <u>Allowed 503(b)(9) Administrative Expense Claim</u>.  Allowed 503(b)(9) Administrative Expense Claims shall be paid from the GUC Designated Funds; *provided*, *however*, that any Allowed 503(b)(9) Administrative Expense Claims shall be satisfied first by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied in full.

2.1.2    <u>Allowed Other Administrative Expense Claims</u>.  Allowed Other Administrative Expense Claims shall be paid from the Wind-Down Funds; *provided*, *however*, that the GUC Designated Funds may be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

2.1.3    <u>Allowed Professional Claims</u>.  Allowed Professional Claims shall be paid from the Wind-Down Funds and, with respect to Allowed Professional Claims incurred prior to closing of the Sale, from the Carve-Out Funds; *provided*, *however*, that the GUC Designated Funds may be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

2.1.4    <u>Allowed Committee Claims</u>.  Allowed Committee Claims shall be paid solely from the GUC Designated Funds.

2.2    **Treatment of Allowed Priority Tax Claims.**  Each holder of an Allowed Priority Tax Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim: (a) the amount of such Allowed Priority Tax Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Priority Tax Claim; or (b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee.  Allowed Priority Tax Claims shall be paid from the GUC Designated Funds; *provided*, *however*, that any Allowed Priority Tax Claims shall be satisfied first by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied in full.

## ARTICLE 3 – CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1    **Classification of Claims and Equity Interests.**  Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests.  Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of treatment under the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise satisfied or settled prior to the Effective Date.  An Equity Interest is also placed in a particular Class for the purpose of treatment under the Plan only to the extent that such Equity Interest is an Allowed Equity Interest in that Class and such Equity Interest has not been paid, released, or otherwise satisfied or settled prior to the Effective Date.

3.2    **Summary of Classification.**  The Plan constitutes a separate chapter 11 plan for each Cetero entity and, unless otherwise explained herein, the classifications set forth in Classes 1 through 7 shall be deemed to apply to each Cetero entity, as applicable.  For purposes of organization, voting, and all confirmation matters with respect to Claims and Equity Interests, the Plan classifies the Claims against and the Equity Interests in each Cetero entity as follows:

| Class | Claims/Equity Interest | Status | Voting Rights |
|-------|------------------------|--------|---------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept the Plan |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to accept the Plan |
| Class 3 | First Lien Claims | Impaired | Entitled to vote on the Plan |
| Class 4 | Second Lien Claims | Impaired | Entitled to vote on the Plan |
| Class 5 | General Unsecured Claims | Impaired | Deemed to reject the Plan |
| Class 6 | Intercompany Claims | Impaired | Deemed to reject the Plan |
| Class 7 | Equity Interests | Impaired | Deemed to reject the Plan |

3.3     **Impairment Controversies.**  If a controversy arises as to whether any Class of Claims or Class of Equity Interests is impaired under the Plan, such Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy differently upon motion of the party challenging the characterization of a particular Class of Claims or Class of Equity Interests under the Plan.

### ARTICLE 4 – TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

4.1     **Class 1 – Allowed Priority Non-Tax Claims**

1.      Classification: Class 1 consists of Priority Non-Tax Claims.

2.      Treatment: Each holder of an Allowed Priority Non-Tax Claim that is not assumed or satisfied by the Purchasers as part of the Sale shall, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive (a) the amount of such Allowed Priority Non-Tax Claim, without interest, in Cash, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Priority Claim; or (b) such other treatment as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee.  Allowed Priority Non-Tax Claims shall be paid from the GUC Designated Funds; *provided*, *however*, that any Allowed Priority Non-Tax Claims shall be satisfied first by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied in full.

3.      Voting: Class 1 is not impaired by the Plan, and each holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

4.2     **Class 2 – Allowed Other Secured Claims**

1.      Classification: Class 2 consists of Other Secured Claims.

2.      Treatment: Each holder of an Allowed Other Secured Claim that is not assumed or satisfied by the Purchaser as part of the Sale shall, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive either:

(a)     Cash equal to the amount of such Allowed Other Secured Claim or such other amount as may be agreed upon by the Wind-Down Administrator and the holder of such Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Other Secured Claim, and all Liens, Claims, charges, or other encumbrances asserted by the holder of such Allowed Other Secured Claim shall be extinguished and of no further force or effect; or

(b)     subject to the Sale, a return of the collateral or other property that secures the Allowed Other Secured Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date that is twenty (20) Business Days after such Claim becomes an Allowed Other Secured Claim, and all Liens, Claims, charges, or other encumbrances asserted by the holder of such Allowed Other Secured Claim shall be extinguished and of no further force or effect.

An Allowed Other Secured Claims paid in accordance with the foregoing subclause (a) shall be paid from the Wind-Down Funds; *provided*, *however*, that the GUC Designated Funds may be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

3.    Voting: Class 2 is not impaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.3    **Class 3 – Allowed First Lien Claims**

1.    Classification: Class 3 consists of First Lien Claims.

2.    Allowance: The First Lien Claims are Allowed and deemed to be Allowed Claims in Class 3 in accordance with the Final DIP Order.

3.    Treatment:  In exchange for full and final satisfaction, settlement, release, and discharge of the First Lien Claims, and in addition to the consideration received by the holders of First Lien Claims under the Final DIP Order and the Sale Order:

(a)    each holder of an Allowed First Lien Claim shall receive the exculpation and releases set forth herein;

(b)    the Surplus Wind-Down Funds, if any, shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement) as soon as practicable after all payments on account of Allowed Other Administrative Expense Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Wind-Down Administrator Fees and other costs incurred for the administration of the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget, in each case pursuant to and in accordance with the Plan, have been made from the Wind-Down Funds; and

(c)    after satisfaction from the Carve-Out Funds of all Allowed Professional Claims incurred prior to the closing of the Sale, any Carve-Out Funds remaining in the Carve-Out Account shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement) as soon as practicable after the payment of such Allowed Professional Claims.

The holders of First Lien Claims have agreed to subordinate certain of their rights to receive the GUC Designated Funds, the Wind-Down Funds, and the Carve-Out Funds in favor of (a) holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims and (b) Liquidating Trustee Fees and other costs incurred by the Liquidating Trust, Wind-Down Administrator Fees and other costs incurred for the administration of the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget, and Statutory Fees, each of which shall receive the treatment accorded to them in the Plan.

4.    Voting: Class 3 is impaired by the Plan.  Therefore, holders of Class 3 First Lien Claims are entitled to vote to accept or reject the Plan.

4.4    **Class 4 –Allowed Second Lien Claims**

1.    Classification: Class 4 consists of Second Lien Claims.

2.    Allowance: The Second Lien Claims are Allowed and deemed to be Allowed Claims in Class 4 in accordance with the Final DIP Order.

11

3.    <u>Treatment</u>: In exchange for full and final satisfaction, settlement, release, and discharge of the Second Lien Claims, each holder of an Allowed Second Lien Claim shall receive the exculpation and releases set forth herein.

4.    <u>Voting</u>: Class 4 is impaired by the Plan.  Therefore, holders of Class 4 Second Lien Claims are entitled to vote to accept or reject the Plan.

4.5    **Class 5 – General Unsecured Claims**

1.    <u>Classification</u>: Class 5 consists of General Unsecured Claims.

2.    <u>Treatment</u>: Each holder of an Allowed General Unsecured Claim may, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive its Pro Rata Share from the Net GUC Designated Funds as determined by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.  Allowed General Unsecured Claims shall be paid by the Liquidating Trustee solely from the Net GUC Designated Funds.

3.    <u>Voting</u>: Class 5 is impaired.  Holders of Class 5 General Unsecured Claims are presumed to have rejected the Plan.  Therefore, holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.6    **Class 6 – Intercompany Claims**

1.    <u>Classification</u>: Class 6 consists of Intercompany Claims.

2.    <u>Treatment</u>: Intercompany Claims shall be released, waived, and discharged on the Effective Date.  Holders of Intercompany Claims will not be entitled to, and will not receive or retain any property under the Plan on account of Intercompany Claims.

3.    <u>Voting</u>: Class 6 is impaired and holders of Class 6 Intercompany Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

4.7    **Class 7 – Equity Interests**

1.    <u>Classification</u>: Class 7 consists of Equity Interests.

2.    <u>Treatment</u>: The Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Equity Interests will not be entitled to, and will not receive or retain, any property under the Plan on account of the Equity Interests.

3.    <u>Voting</u>: Class 7 is impaired and holders of Class 7 Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 7 Equity Interests are not entitled to vote to accept or reject the Plan.

4.8    **KRG Entities' Claim Waiver.**  For the avoidance of doubt, pursuant to and in accordance with the Global Settlement Agreement, the KRG Entities have forever waived and released their General Unsecured Claims against the Debtors related to the Building Loan Notes, in consideration for, and conditioned upon the concurrent effectiveness of, the release in favor of the KRG Entities set forth in Section 5 of the Global Settlement Agreement.

4.9    **Reservation of Rights.**  The Liquidating Trustee reserves all rights to move for subordination, recharacterization, or make any other challenge, with respect to the claims on account of the Building Loan Notes not held by the KRG Entities, and all Entities reserve all rights with respect thereto.

4.10    **Subordination of Deficiency Claims.**  For the avoidance of doubt, pursuant to and in accordance with the Global Settlement Agreement, (a) any and all prepetition deficiency claims of the Prepetition First Lien Secured Parties (as defined in the Final DIP Order) and the Prepetition Second Lien Secured Parties (as defined in the Final DIP Order) and the Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) of such parties, and in each case, all Liens securing such Claims, and (b) the Claims and Liens of the DIP Secured Parties (as defined in the Final DIP Order), shall in each case be subordinated to the extent, and solely to the extent, necessary to permit distribution of the GUC Designated Funds in accordance with the Global Settlement Agreement and the Plan.

## ARTICLE 5 – ACCEPTANCE OR REJECTION OF PLAN; CRAMDOWN

5.1     **Classes and Claims Entitled to Vote.**  Only holders of Class 3 First Lien Claims and Class 4 Second Lien Claims as of the Record Date shall be entitled to vote to accept or reject the Plan.  Classes 1 and 2 are not impaired under the Plan, shall not be entitled to vote to accept or reject the Plan and shall be presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 5, 6, and 7 are impaired under the Plan, are presumed to have rejected the Plan, and shall not be entitled to vote to accept or reject the Plan.

5.2     **Acceptance by a Class of Creditors.**  Consistent with section 1126(c) of the Bankruptcy Code and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of Creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

5.3     **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by acceptance of the Plan by an impaired Class of Claims.  With respect to the impaired Classes of Claims that are deemed to reject the Plan or that reject the Plan, Cetero shall request the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE 6 – MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     **Liquidating Trust**

6.1.1     Establishment of Liquidating Trust.  On the Effective Date, the Liquidating Trust shall be established hereunder and pursuant to the Liquidating Trust Agreement for the sole purpose of administering the Liquidating Trust Assets, with no objective to continue or engage in the conduct of a trade or business.

6.1.2     Liquidating Trustee.  On the Effective Date, the Liquidating Trustee shall be appointed as the trustee for the Liquidating Trust in accordance with the Liquidating Trust Agreement and shall have all the rights and powers set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee shall serve without any bond and shall act in accordance with the Liquidating Trust Agreement and the Plan.

6.1.3     Funding of the Liquidating Trust.  On the Effective Date, the Liquidating Trust Assets shall vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries free and clear of all Liens, Claims, charges, or other encumbrances.  The Plan shall be considered a motion pursuant to section 105, 363, and 365 of the Bankruptcy Code for such relief.  The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Liquidating Trust Beneficiaries.  The Liquidating Trust shall not be deemed a successor in interest of Cetero for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.  The Liquidating Trust Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust.

In connection with the transfer of the Liquidating Trust Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust will vest in the Liquidating Trust and its representatives, and Cetero and the Liquidating Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

6.1.4     GUC Designated Funds.  All Allowed Committee Claims, Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, the Liquidating Trustee Fees and other costs incurred by the Liquidating Trust, and Statutory Fees shall be paid by the Liquidating Trustee, in accordance with the Plan, from the Liquidating Trust Assets.  All Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied.  The GUC Designated Funds may also be used, at the discretion of the Liquidating Trustee, as the Liquidating Trustee deems necessary to effectuate the intent of the Global Settlement Agreement, including funding any deficiency in the Final Wind-Down Budget.

6.1.5     Powers of the Liquidating Trustee.  The Liquidating Trustee shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) initiate, file, or prosecute objections to Claims, in accordance with Section 7.1.1 hereof, including seeking the examination of any Entity under and subject to the provisions of Bankruptcy Rule 2002 in connection thereof; (c) stand in the shoes of each of the Debtors for all purposes in connection with the prosecution of or objections to such Claims; (d) make all distributions contemplated to be made by it under the Plan; (e) employ professionals to

represent it with respect to its responsibilities; (f) pay the Liquidating Trustee Fees and other costs incurred by the Liquidating Trust; (g) file final federal, state, foreign, and, to the extent applicable, local tax returns, and, to the extent necessary, pay such taxes from the GUC Designated Funds; (h) represent each of the Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the GUC Designated Funds or any Liquidating Trust Beneficiary; and (i) exercise such other powers as may be vested in the Liquidating Trustee by the Bankruptcy Court, pursuant to the Plan or the Liquidating Trust Agreement, or as deemed by the Liquidating Trustee to be necessary or proper to implement the provisions hereof.  The Liquidating Trustee shall file all reports and undertake all actions, not otherwise specified in the Plan, required by the Bankruptcy Code and the Bankruptcy Rules.

6.1.6    Exculpation/Indemnification.  The Liquidation Trustee and its employees, professionals, agents, or representatives, if any, shall be entitled to the protections set forth in the Liquidating Trust Agreement with regard to exculpation and indemnification provisions.

6.1.7    Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Liquidating Trustee on or after the Effective Date (including taxes), any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Liquidating Trustee, and any other reasonable costs incurred by the Liquidating Trust shall be paid in Cash solely from the GUC Designated Funds without any further order of the Bankruptcy Court in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, costs and fees incurred by the Claims Agent in connection with processing proofs of Claims shall be paid by the Liquidating Trustee and shall be deemed Liquidating Trustee Fees for purposes of the Plan.

6.1.8    Termination.  The Liquidating Trust shall terminate when the Liquidating Trustee has performed all of its duties under the Plan and the Liquidating Trust Agreement, including the final distribution of all the property of the Liquidating Trust, which date shall not be more than five (5) years after the Effective Date; *provided*, *however*, the Court may upon good cause shown order the Liquidating Trust to remain open so long as it may be necessary to liquidate and distribute all of its property.

6.1.9    Records.  The Liquidating Trustee shall maintain good and sufficient books and records of account relating to the GUC Designated Funds, the management thereof, all related transactions undertaken, all fees and expenses incurred by the Liquidating Trustee, and all distributions contemplated or effectuated under the Plan.  Upon the entry of a Final Decree closing the Chapter 11 Case of Reorganized CRS, the Liquidating Trustee may destroy or otherwise dispose of all records maintained by the Liquidating Trustee.

6.2    **Reorganized CRS**

6.2.1    Vesting of Assets in Reorganized CRS.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, and except as set forth in the DIP Order and the Sale Order, on the Effective Date, all property in each Estate and any property acquired by any of the Debtors pursuant to the Plan, including the Wind-Down Funds, shall vest in Reorganized CRS, free and clear of all Liens, Claims, charges, or other encumbrances.  In addition, on the Effective Date, the Carve-Out Funds shall be transferred to Reorganized CRS.

6.2.2    Limited Survival of Reorganized CRS.  From and after the Confirmation Date, Reorganized CRS shall continue in existence for the sole purpose of administering, through the Wind-Down Administrator, the assets vested in it pursuant to Section 6.2.1 hereof, including the Wind-Down Funds and the Carve-Out Funds, with no objective to continue or engage in the conduct of a trade or business.  From and after the Effective Date, the Wind-Down Administrator shall be deemed the sole shareholder and shall be appointed as the sole director and officer of Reorganized CRS (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by the Plan to permit and authorize such appointment) and shall serve in such capacity until the dissolution of Reorganized CRS pursuant to the Plan.  All corporate governance activities of Reorganized CRS shall be exercised by the Wind-Down Administrator, subject to the terms of the Plan.

6.2.3    Liquidation of Assets.  On and after the Effective Date, Reorganized CRS, through the Wind-Down Administrator, may, without further approval of the Bankruptcy Court, use, sell, assign, transfer, abandon, or otherwise dispose of at a public or private sale any of the Estate Assets (other than the Liquidating Trust Assets, the Wind-Down Funds, and the Carve-Out Funds) for the purpose of liquidating and converting such assets to Cash, making distributions and fully consummating the Plan.  Any Cash proceeds from such Estate Assets shall be added to the Wind-Down Funds and deposited into the Wind-Down Funds Account, and shall become available for distributions by the Wind-Down Administrator in accordance with the provisions of the Plan.

6.2.4    <u>Wind-Down Funds</u>.  The Wind-Down Funds shall be held by Reorganized CRS for the benefit of the holders of Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, and Allowed First Lien Claims.  All Allowed Other Administrative Expense Claims, Allowed Professional Claims, Allowed Other Secured Claims, the Wind-Down Administrator Fees and other cost incurred for the administration of the Wind-Down Funds, and Allowed First Lien Claims shall be paid by the Wind-Down Administrator, in accordance with the Plan, from the Wind-Down Funds; *provided*, *however*, that any Allowed 503(b)(9) Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Priority Non-Tax Claims shall first be satisfied by any Wind-Down Funds remaining in the Wind-Down Funds Account after all other amounts subject to payment from the Final Wind-Down Budget have been satisfied.

6.2.5    <u>Carve-Out Funds</u>.  The Carve-Out Funds shall be held by Reorganized CRS for the benefit of the holders of Allowed Professional Claims, to the extent incurred prior to the closing of the Sale, and as provided in the Final DIP Order.  All Allowed Professional Claims, to the extent incurred prior to the closing of the Sale, and other fees and expenses, as provided in the Final DIP Order, shall be paid by the Wind-Down Administrator, in accordance with the Plan and the Final DIP Order, from the Carve-Out Funds.  Any Carve-Out Funds remaining in the Carve-Out Account after such payments shall be paid to the Exit Facility Agent (as defined in the Sale Support Agreement) for application in accordance with the Exit Loan Agreement (as defined in the Sale Support Agreement).

6.2.6    <u>Powers of the Wind-Down Administrator</u>.  The Wind-Down Administrator shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) initiate, file, or prosecute objections to Claims, in accordance with Section 7.1.2 hereof, including seeking the examination of any Entity under and subject to the provisions of Bankruptcy Rule 2002 in connection thereof; (c) stand in the shoes of each of the Debtors for all purposes in connection with the prosecution of or objections to such Claims; (d) make all distributions contemplated to be made by it under the Plan; (e) employ professionals to represent it with respect to its responsibilities; (f) pay the Wind-Down Administrator Fees and other costs incurred for administering the Wind-Down Funds up to the amount provided in the Final Wind-Down Budget; (g) represent each of the Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Wind-Down Funds or the Carve-Out Funds; and (h) exercise such other powers as may be vested in the Wind-Down Administrator by the Bankruptcy Court, pursuant to the Plan, or as deemed by the Wind-Down Administrator to be necessary or proper to implement the provisions hereof.

6.2.7    <u>Expenses Incurred on or After the Effective Date</u>.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Wind-Down Administrator on or after the Effective Date (including taxes), any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Wind-Down Administrator, and any other reasonable costs incurred for the administration of the Wind-Down Funds shall be paid up to the amount provided in the Final Wind-Down Budget in Cash from the Wind-Down Funds without any further order of the Bankruptcy Court.

6.2.8    <u>Termination</u>.  The duties, responsibilities, and powers of the Wind-Down Administrator shall terminate after all Wind-Down Funds have been distributed in accordance with the Plan.

6.2.9    <u>Records</u>.  The Wind-Down Administrator shall maintain good and sufficient books and records of account relating to the Wind-Down Funds, the management thereof, all related transactions undertaken, all fees and expenses incurred by the Wind-Down Administrator, and all distributions contemplated or effectuated under the Plan.  Upon the dissolution of CRS, and after offering to provide such records to the Liquidating Trustee upon 15 days prior written notice, the Wind-Down Administrator may destroy or otherwise dispose of all records maintained by Wind-Down Administrator.  The costs of any transfer of records to the Liquidating Trustee shall be borne by the Liquidating Trust.

6.3    **Record Sharing.**  Each of the Liquidating Trustee, the Wind-Down Administrator, and the Purchasers shall, upon reasonable request by the other, share its respective books and records relating to Cetero, including the Sale, the Chapter 11 Cases, and the Canadian Proceedings, or provide reasonable access thereto.  Reorganized CRS shall provide access to the Liquidating Trustee to Reorganized CRS's books and records in respect of Claims being administered by the Liquidating Trustee and shall not dispose of any such books and records without the prior consent of the Liquidating Trustee.

6.4    **Restructuring Transactions.**  After confirmation of the Plan, Cetero or the Wind-Down Administrator may take all actions as may be necessary or appropriate to effect any corporate reorganization or other transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, which may include one or more amendments, amalgamations, restructurings, reorganizations, liquidations, winding-up, dissolutions,

15

transfers, assignments, assumptions, or other transactions as may be determined necessary or appropriate by Cetero (collectively, the "Restructuring Transactions"), including: (1) the execution and delivery of appropriate agreements or other documents of amendment, amalgamation, restructuring, reorganization, liquidation, winding-up, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, including, where appropriate, with respect to the assumption of liabilities upon a transfer or assignment of assets or liquidation or winding-up, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate articles, agreements, certificates and other documents of amendment, amalgamation, restructuring, reorganization, liquidation, winding-up, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that Cetero and the Wind-Down Administrator determine are necessary or appropriate.

6.5      **Corporate Existence and Final Decrees Closing the Chapter 11 Cases**

6.5.1      Officers and Directors of Cetero.  All officers and directors of each Cetero entity serving immediately prior to the Effective Date shall be deemed to have been removed and relieved of all duties as of the Effective Date.

6.5.2      Dissolution of the Fully Administered Debtors.  Each of the Cetero entities other than CRS (collectively, the "Fully Administered Debtors") (a) shall be liquidated pursuant to the Plan, (b) shall (i) in respect of the U.S. Debtors, be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the applicable Debtor and (ii) in respect of the Canadian Debtors, be dissolved in accordance with applicable laws, and (c) as soon as practicably thereafter shall file with the Secretary of State or other appropriate office for the jurisdiction of its organization the appropriate articles, agreements, certificates, and other documents of cancellation or dissolution.  Upon filing of such articles, agreements, certificates, or other documents of cancellation or dissolution, each such Cetero entity immediately shall cease to be, and not continue as, a body corporate or partnership, as applicable, for any purpose whatsoever.  Except as otherwise provided hereof or as part of the Restructuring Transactions, each such liquidation and dissolution shall be effective as of the Effective Date pursuant to the Plan and the Confirmation Order.

6.5.3      Final Decree Closing the Chapter 11 Cases of the Fully Administered Debtors.  In addition, pursuant to the Plan, Cetero requests entry of a Final Decree, which shall be part of the Confirmation Order, closing the Chapter 11 Cases of the Fully Administered Debtors effective as of the Effective Date.  Specifically, on or after the Effective Date, Cetero's counsel shall file a certification of counsel (the "Certification"), substantially in the form included in the Plan Supplement, (a) certifying that, in accordance with Rule 5009-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware, the Plan has been substantially consummated and all Statutory Fees in respect of the Fully Administered Debtors have been paid and (b) attaching a final report with respect to the Fully Administered Debtors.  Upon the filing of the Certification, the Final Decree for the Fully Administered Debtors shall become effective and the Clerk of the Court shall close the Chapter 11 Cases of the Fully Administered Debtors.  After the closing of the Chapter 11 Cases of the Fully Administered Debtors, any outstanding motions, contested matters, adversary proceedings, and other unresolved matters in the Chapter 11 Cases shall be administered in the Chapter 11 Case of Reorganized CRS.

6.5.4      Dissolution of Reorganized CRS.  Following completion of all actions required by the Wind-Down Administrator pursuant to the Plan, Reorganized CRS shall be liquidated pursuant to the Plan, shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by it, and shall file with the Secretary of State of North Carolina a certificate of dissolution.  Upon filing of such certificate of dissolution, Reorganized CRS immediately shall cease to be, and not continue as, a body corporate for any purpose whatsoever.

6.5.5      Closing of Chapter 11 Case of Reorganized CRS.  Following completion of all actions required by the Plan, the Liquidating Trustee shall request that the Court enter a Final Decree closing the Chapter 11 Case of Reorganized CRS.

6.6      **Corporate Action, Authorizations, and Approvals.**  Each of the matters provided for by the Plan involving the corporate structure of Cetero or corporate or related actions to be taken by or required of Cetero, the Liquidating Trustee, or the Wind-Down Administrator, including the Restructuring Transactions, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken on or prior to the Effective Date, ratified in all respects without further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court, without the need for any further state, federal, provincial, or local regulatory approvals, and without any requirement of further action by the creditors, members, shareholders, directors, officers, managers, or partners of any of the Debtors.

6.7    **Government Approvals Not Required.**  The Plan and the Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto.

**ARTICLE 7 – PROCEDURES FOR DISPUTED CLAIMS**

7.1    **Objections to Claims and Resolution of Disputed Claims**

7.1.1    <u>Authority of Liquidating Trustee to Object to Claims.</u>  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Liquidating Trustee shall be authorized, and vested with the right, to object to any and all 503(b)(9) Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and General Unsecured Claims and initiate, file, or prosecute such objections on behalf of Cetero and its Estates so as to have the Bankruptcy Court determine the Allowed amount, if any, of such Claims to be paid under the Plan.  Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee may also object to any Claims set forth in Section 7.1.2 hereof with the consent of the Wind-Down Administrator.  All objections to Claims must be filed with the Bankruptcy Court and served only upon the holder of the Claim by no later than the Claims Objection Deadline or such later date set by order of the Bankruptcy Court upon the motion of the Liquidating Trustee.  Responses and litigation over the allowance of any Claim that is the subject of an objection shall be governed by the Bankruptcy Code, the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court.  From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Liquidating Trustee elects to withdraw such objection or elects to compromise, settle, or otherwise resolve any such objection in its sole and absolute discretion.

7.1.2    <u>Authority of Wind-Down Administrator to Object to Claims.</u>  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Wind-Down Administrator shall be authorized, and vested with the right, to object to any and all Other Administrative Expense Claims and Other Secured Claims, and initiate, file, or prosecute such objections on behalf of Cetero and its Estates so as to have the Bankruptcy Court determine the Allowed amount, if any, of such Claims to be paid under the Plan.  Notwithstanding anything to the contrary in the Plan, the Wind-Down Administrator may also object to any Claims set forth in Section 7.1.1 hereof with the consent of the Liquidating Trustee.  All objections to Claims must be filed with the Bankruptcy Court and served only upon the holder of the Claim, by no later than the Claims Objection Deadline or such later date set by order of the Bankruptcy Court upon the motion of the Wind-Down Administrator without notice and a hearing.  Responses and litigation over the allowance of any Claim that is the subject of an objection shall be governed by the Bankruptcy Code, the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court.  From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Wind-Down Administrator elects to withdraw such objection or elects to compromise, settle, or otherwise resolve any such objection in its sole and absolute discretion.

7.1.3    <u>No Adversary Proceeding.</u>  Notwithstanding anything to the contrary in the Bankruptcy Code or the Bankruptcy Rules, including Bankruptcy Rule 7001, the Liquidating Trustee and the Wind-Down Administrator shall be authorized to initiate, file, or prosecute objections to Allowed Claims, including with respect to the validity, priority, or extent of a Lien or other interest in property, without the commencement of an adversary proceeding.

7.1.4    <u>Objections to Claims.</u>  Except as set forth the Plan, no Entity shall have the right to object to any 503(b)(9) Administrative Expense Claims, Other Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims.

7.2    **No Distributions Pending Allowance.**  If an objection to a Claim or portion thereof is filed as forth in Section 7.1 hereof, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.  Until such time, (a) the Liquidating Trustee may, in its sole and absolute discretion, withhold from the GUC Distributed Funds to be distributed pursuant to the Plan the portion of the GUC Designated Funds allocable to Disputed 503(b)(9) Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed General Unsecured Claims until such Disputed Claims become Allowed, and (b) the Wind-Down Administrator may, in its sole and absolute discretion, withhold from the Wind-Down Funds to be distributed pursuant to the Plan the portion of the Wind-Down Funds allocable to Disputed Other Administrative Expense Claims and Disputed Other Secured Claims.

7.3    **Estimation.**  The Liquidating Trustee and the Wind-Down Administrator may, at any time, request that the Bankruptcy Court estimate any Disputed Claim that is a contingent and/or unliquidated Claim that it has authority to object to, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection has been filed to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee or the Wind-Down Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

## ARTICLE 8 – PROVISION GOVERNING DISTRIBUTIONS

8.1    **Distributions to Holders of Allowed General Unsecured Claims.**  The Liquidating Trustee may determine, in its sole and absolute discretion, the timing of any initial, interim, and final distributions to holders of Allowed General Unsecured Claims, taking into account appropriate reserves for Disputed Claims, in accordance with Section 7.2 hereof, and may withhold any additional portions of GUC Designated Funds that it determines, in its sole and absolute discretion, should be withheld to cover anticipated Liquidating Trustee Fees, other costs for the administration of the Liquidating Trust Assets, or Statutory Fees.

8.2    **Calculation of Amounts to Be Distributed.**  Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Neither Cetero, the Wind-Down Administrator nor the Liquidating Trustee shall have any obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Voting Deadline.

8.3    **Undeliverable Distributions and Unclaimed Property.**  In the event that any distribution to any holder of a Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Wind-Down Administrator or the Liquidating Trustee, as applicable, has been provided with sufficient evidence in writing of such Claim holder's new address; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months after the date the Wind-Down Administrator or Liquidating Trustee, as applicable, first attempts a distribution to such holder, in which case such unclaimed property shall be added back to the Wind-Down Funds or the GUC Designated Funds, as applicable.

8.4    **Minimum Distribution.**  Notwithstanding anything to the contrary in the Plan, neither the Wind-Down Administrator nor the Liquidating Trustee shall be required to make a distribution of less than $50.00 to any holder of a Claim unless either a request therefor is made in writing to the Wind-Down Administrator or the Liquidating Trustee, as applicable, by the holder of the Claim with respect to such Claim or the Wind-Down Administrator or the Liquidating Trustee, as applicable, so determines to make such payment in its sole and absolute discretion.

8.5    **Tax Identification.**  Each Entity holding an Allowed Claim is required to provide any information necessary to effect the necessary information reporting and withholding of applicable taxes with respect to distributions to be made under the Plan.  The Wind-Down Administrator or the Liquidating Trustee, as applicable, shall be entitled in its sole discretion to withhold any distributions to a holder of an Allowed Claim that fails to provide tax identification or social security information upon written request.  Notwithstanding any other provision of this Plan, (a) each holder of an Allowed Claim that is to receive a distribution on account thereof pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Wind-Down Administrator or the Liquidating Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Wind-Down Administrator or the Liquidating Trustee, as applicable, in connection with such distribution.  Any property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as unclaimed property pursuant to Section 8.3 hereof.

## ARTICLE 9 – BAR DATES

9.1    **Proofs of Claim**

9.1.1    Entities Required to File Proofs of Claim. Pursuant to the Plan and except as otherwise provided herein or by separate order of the Bankruptcy Court, the following Entities holding Claims against the Debtors that arose (or

are deemed to have arisen) before the Petition Date, including Claims for rejection damages, must file a proof of Claim **on or before the General Bar Date**, which is **45 days after the Effective Date at 4:00 p.m. (prevailing Eastern Time)**:

> (a)    any Entity whose Claim against a Debtor is not listed in the respective Schedules or is listed on the Schedules as contingent, unliquidated, or disputed;

> (b)    any Entity who desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; or

> (c)    any Entity who believes that its Claim is improperly classified in the Schedules or is listed in an incorrect amount in the Schedules and who desires to have its Claim allowed in a different classification or amount.

9.1.2    <u>Claims With Respect to Which No Proof of Claim Is Required</u>.  No proof of Claim is required to be filed with respect to the following Claims that would otherwise be subject to the General Bar Date:

> (a)    a Claim with respect to which a signed proof of Claim against the respective Debtor(s) has already been filed with the Bankruptcy Court or the Claims Agent in a form substantially similar to the Official Form 10;

> (b)    a Claim listed on the Schedules; *provided* that (a) the Claim is not scheduled as contingent, unliquidated, or disputed; (b) the holder of the Claim does not disagree with the amount, nature, and priority of the Claim as set forth in the Schedules; and (c) the holder of the Claim does not dispute that the Claim is an obligation of the specific Debtor(s) against which the Claim is listed in the Schedules;

> (c)    a Claim that has previously been Allowed by order of this Court or pursuant to the Plan, including First Lien Claims and Second Lien Claims; and

> (d)    a Claim against the Debtors that has been paid, released, or otherwise settled by the Debtors or any other Entity.

9.1.3    <u>Contents and Manner of Service</u>.  Each proof of Claim must: (a) be written in English; (b) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used); (c) conform substantially with the form of proof of Claim included in the Plan Supplement; (d) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available; (e) be signed by the holder of the Claim or by an authorized agent or legal representative of the holder of the Claim; (f) be an original proof of Claim; and (g) be delivered by first class United States mail, postage prepaid, to:

> Contract Research Solutions, Inc. Claims Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5013
> New York, New York 10150-5013

or, if sent by hand delivery or overnight courier, to:

> Contract Research Solutions, Inc. Claims Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

so as to be **<u>actually received</u>** by Epiq Bankruptcy Solutions, LLC on or before the General Bar Date.  **Photocopies, facsimiles, or electronic mail will <u>not</u> be accepted**.

9.1.4    <u>Amended Schedules Bar Date</u>.  Solely in the event that Cetero amends its Schedules after the date on which they were initially filed, any holder of a Claim whose Claim is modified by such amendment must file proofs of Claim with respect to such Claims, by the later of (a) the General Bar Date and (b) 21 days after the date on which Cetero provides notice of an amendment to its respective Schedules (such date, the "<u>Amended Schedules Bar Date</u>").

9.2 **Requests for Payment of Administrative Expense Claim**

Pursuant to the Plan and except as otherwise provided by separate order of the Bankruptcy Court, any request for payment of Administrative Expense Claim, to the extent such Administrative Expense Claim (a) arose or was incurred on or before the Effective Date and (b) has not been paid, released, or otherwise settled, must be filed and served **on or before the General Bar Date**.

9.2.1 Contents and Manner of Service of Requests for Payment of 503(b)(9) Administrative Expense Claims and Other Administrative Expense Claims. All requests for payment of 503(b)(9) Administrative Expense Claims or Other Administrative Expense Claims must: (a) be written in English; (b) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used); (c) conform substantially with the form of request for payment included in the Plan Supplement; (d) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available; (e) be signed by the holder of the Administrative Expense Claim or by an authorized agent or legal representative of the holder of the Administrative Expense Claim; (f) be an original; and (g) be delivered by first class United States mail, postage prepaid, to:

> Contract Research Solutions, Inc. Claims Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5013
> New York, New York 10150-5013

or, if sent by hand delivery or overnight courier, to:

> Contract Research Solutions, Inc. Claims Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017

so as to be **actually received** by Epic Bankruptcy Solutions, LLC **on or before the General Bar Date**. **Photocopies, facsimiles, or electronic mail will _not_ be accepted**.

9.2.2 Professional Claims and Committee Claims. All final requests for payment of Professional Claims and Committee Claims shall be filed with the Bankruptcy Court and served only on: (a) Cetero, Contract Research Solutions, Inc., 2000 Regency Parkway, Suite 255, Cary, North Carolina 27518; (b) counsel to Cetero, Paul Hastings LLP, 191 North Wacker Drive, Thirtieth Floor, Chicago, Illinois 60606, Attn: Marc J. Carmel, Esq., and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary, Esq.; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (re: In re Contract Research Solutions, Inc., et al.); (d) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Bradford J. Sandler, Esq., and 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4003, Attn: Shirley S.Cho, Esq.; and (e) counsel to Freeport Financial LLC, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, Illinois 60606, Attn: Peter P. Knight, Esq., **on or before the General Bar Date**. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims and Committee Claims shall be determined by the Bankruptcy Court.

9.3 **Procedures for Providing Notice of Bar Dates.** No later than 5 Business Days after the Effective Date, the Liquidating Trustee shall send the notice of Effective Date, substantially in the form included in the Plan Supplement, by first class United States mail, postage prepaid, on all known creditors, equity security holders, and parties in interest. The Liquidating Trustee shall mail notice of the General Bar Date only to the last known mailing address for each such creditor, equity security holder, or other party in interest.

9.4 **Failure to File a Timely Proof of Claim or Request Payment of Administrative Expense Claim**

**ANY ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM OR REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM BUT FAILS TO DO SO BEFORE THE APPLICABLE BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM OR REQUEST IN ANY MANNER (OR FILING A PROOF OF CLAIM OR REQUEST FOR PAYMENT WITH RESPECT THERETO) AGAINST CETERO, THE ESTATES, THE PURCHASERS, THE WIND-DOWN ADMINISTRATOR, THE LIQUIDATING TRUSTEE, OR ANY OF THE FOREGOING ENTITIES' PREDECESSORS, SUCCESSORS, ASSIGNS, AFFILIATES,**

**SUBSIDIARIES, MEMBERS, SHAREHOLDERS, DIRECTORS, OFFICERS, PRINCIPALS, AGENTS, EMPLOYEES, ATTORNEYS, REPRESENTATIVES, ADVISORS, AND OTHER PROFESSIONALS, AND, MOREOVER, CETERO SHALL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS OR LIABILITY WITH RESPECT TO OR ARISING FROM SUCH CLAIM OR REQUEST.**

### ARTICLE 10 – EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1    **Rejection.**  Effective on and as of the Effective Date, all Executory Contracts and Unexpired Leases that exist between a Cetero entity and any Entity and that (a) have not previously been assumed, assumed and assigned, or rejected by Cetero, (b) are not subject to a pending motion to assume, assume and assign, or reject as of the Effective Date, (c) are not subject to a notice of rejection pursuant to the Rejection Procedures Order, or (d) are not subject to a notice of assumption and assignment pursuant to the Sale Order, will be deemed rejected pursuant to section 365 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases rejected pursuant to the Plan.

10.2    **Claims for Rejection Damages.**  Proofs of Claim for damages allegedly arising from the rejection pursuant to the Plan or the Confirmation Order of any Executory Contract and Unexpired Lease must be filed and served in accordance with Section 9.1 hereof.

### ARTICLE 11 – SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

11.1    **Compromise and Settlement of Claims, Equity Interests, and Controversies.**  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of Cetero, its Estates, and the holders of Claims and Equity Interests, and is fair, equitable, and reasonable.

11.2    **Releases by the Debtors.**  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtors, including throughout the Chapter 11 Cases and the Canadian Proceedings, and the implementation of the liquidation contemplated by the Plan (including the Restructuring Transactions), prior to, on, and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors and the Estates from any and all actions, Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that the Debtors or the Estates or each of their respective Affiliates (whether individually or collectively) or the holder of any Claim or Equity Interest or other Entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring (including the Restructuring Transactions), the Sale Support Agreement, the Chapter 11 Cases, the Canadian Proceedings, the Global Settlement Agreement, the Sale, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases or the Canadian Proceedings, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Sale Support Agreement, the Global Settlement Agreement, the Asset Purchase Agreement, or related agreements, instruments, or other documents or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence, in each case as determined by Final Order of a court of competent jurisdiction; *provided*, *however*, that nothing in this Section 11.3 shall release the Purchasers, Cetero, or any of their affiliates from their obligations under the Asset Purchase Agreement or the Operations Support Agreement.

11.3    **Releases by Holders of Claims.**  Except as otherwise set forth in the Plan, on and after the the Effective Date of the Plan, to the fullest extent permitted by applicable law, each holder of a Claim (a) voting to accept the Plan or (b) having an opportunity but not objecting to the release contained in this paragraph shall be deemed to have expressly, unconditionally, irrevocably, generally, and individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that such Entity (whether individually or collectively) ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring (including the Restructuring Transactions), the Sale Support Agreement, the Chapter 11 Cases, the Canadian Proceedings, the Global Settlement Agreement, the Sale, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases or the Canadian Proceedings, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Sale Support Agreement, the Global Settlement Agreement, the Asset Purchase Agreement, or related agreements, instruments, or other documents or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence in each case as determined by Final Order of a court of competent jurisdiction.

11.4    **Liabilities to, and Rights of, Governmental Units.**  Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (a) any liability to a Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising on or after the Effective Date; (c) any liability to a Governmental Unit on the part of any Entity other than the Debtors; (d) any valid right of setoff or recoupment by a Governmental Unit; or (e) any criminal liability.  Nothing in the Plan or the Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The injunction provisions contained in the Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Effective Date, pursuing any police or regulatory action.

11.5    **Exculpation.**  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action, and liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

11.6    **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2 AND 11.3 HEREOF OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.5 HEREOF ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES OR THE PROPERTY OR ESTATES OF THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE RELEASED PARTIES AND THE EXCULPATED PARTIES OR AGAINST THE PROPERTY OR ESTATES OF THE RELEASED PARTIES AND THE EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF

CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELATED OR SETTLED PURSUANT TO THE PLAN.

## ARTICLE 12 – CONDITIONS PRECEDENT

12.1    **Conditions Precedent to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan, unless waived pursuant to Section 12.2 hereof:

(a)    the Bankruptcy Court has entered the Confirmation Order, which shall provide that, among other things, the Wind-Down Administrator and the Liquidating Trustee are authorized and directed to take any and all actions necessary or appropriate to consummate the Plan, and such order shall not have been stayed, modified, or vacated on appeal;

(b)    the Canadian Court has entered an order recognizing the Confirmation Order, and such order shall not have been stayed, modified, or vacated on appeal;

(c)    the Operations Support Agreement has expired or has been terminated in accordance with its terms or the Purchasers' consent, or the Liquidation Trustee and the Wind-Down Administrator have entered into such further agreements as reasonably required by the Purchasers to satisfy the obligations under the Operations Support Agreement; and

(d)    all actions, other documents, and agreements necessary to implement the Plan shall have been effected or executed and delivered.

12.2    **Waiver of Conditions Precedent.**  Cetero may waive any of the conditions to the Effective Date set forth in Section 12.1 hereof at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court, and without any formal action other than proceeding to confirm or consummate the Plan.

12.3    **Effect of Non-Occurrence of Conditions to Consummation.**  In the event that one or more of the conditions specified in Section 12.1 hereof have not been waived pursuant to Section 12.2 hereof or have not occurred on or before 120 days after the Confirmation Date, (a) the Confirmation Order may, upon the request of Cetero, be vacated, (b) no distributions under the Plan shall be made, (c) Cetero and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) Cetero's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against Cetero or any other Entity or to prejudice in any manner the rights of Cetero or any Entity in any further proceedings involving Cetero.

## ARTICLE 13 – RETENTION OF JURISDICTION

Following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction of the Chapter 11 Cases and all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    hear and determine motions, applications, adversary proceedings, and contested matters pending as of or commenced after the Effective Date;

(b)    hear and determine objections (whether pending as of or filed after the Effective Date) to, or requests for estimation of any Claim, and to enter any order requiring the filing of proof of any Claim before a particular date;

(c)    ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)     construe and take any action to enforce the Plan and the Confirmation Order;

(f)     issue such orders as may be necessary for the implementation, execution, and consummation of the Plan and to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Confirmation Order, including the injunction, exculpation, and release provisions contained in Article 11 hereof;

(g)     hear and determine all applications for Professional Claims and Committee Claims required by the Plan;

(h)     hear and determine other issues presented or arising under the Plan, including disputes among holders of Claims and arising under agreements, documents, or instruments executed in connection with the Plan;

(i)     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     hear and determine any other matters related hereto and not inconsistent with Chapter 11 of the Bankruptcy Code;

(k)     enter any and all Final Decree of the Debtors;

(l)     hear and determine any action concerning the recovery and liquidation of Estate Assets, wherever located, including litigation to liquidate and recover Estate Assets; and

(m)     to hear and determine any action concerning the determination of taxes, tax refunds, tax attributes, and tax benefits and similar or related matters with respect to Cetero or the Estate including matters concerning federal, state, and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

## ARTICLE 14 – MISCELLANEOUS PROVISIONS

14.1    **Pre-Confirmation Modification.**  Upon notice to the U.S. Trustee and the Committee, Cetero may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

14.2    **Post-Confirmation Immaterial Modification.**  Cetero, with the approval of the Bankruptcy Court and notice to the U.S. Trustee, the Committee, First Lien Agents, and the Second Lien Agent and without notice to all holders of Claims and Equity Interests, insofar as it does not materially and adversely affect the interest of all holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the consummation of the Plan.

14.3    **Post-Confirmation Material Modification.**  The Plan may be altered or amended by Cetero with the consent of the U.S. First Lien Agent and the Committee or the Liquidating Trustee (which consent shall not be unreasonably denied, withheld, or conditioned) after the Confirmation Date but prior to substantial consummation of the Plan in a manner that, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made as provided in section 1127 of the Bankruptcy Code after notice and a hearing.

14.4    **Withdrawal or Revocation of the Plan.**  Cetero reserves the right to seek an order of the Bankruptcy Court revoking or withdrawing the Plan prior to the Effective Date.  If the Bankruptcy Court approves the revocation or withdrawal of the Plan, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.

14.5    **Plan Supplement.**  Cetero intends to file the initial version of the documents comprising the Plan Supplement on or before ten days prior to the Voting Deadline.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement.  Upon its filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at http://www.deb.uscourts.gov, and at the website of the Claims Agent at http://dm.epiq11.com/crs.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court upon entry of the Confirmation Order.

14.6    **Release of Liens.**  Except as otherwise provided in the Plan or the Confirmation Order, all Liens, Claims, charges, or other encumbrances against property of the Debtor or the Estate shall and shall be deemed to be released,

cancelled, terminated, and nullified on the Effective Date, without any further action of any Entity, including further orders of the Bankruptcy Court or the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the *Personal Property Security Act* of any of the applicable provinces of Canada, or in accordance with any other real or personal registry system in any of the applicable provinces of Canada.

14.7    **Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, and that are due by or on the Effective Date shall be paid by the Estate on or before the Effective Date.  All such fees that become due after the Effective Date shall be paid by the Liquidating Trustee from the GUC Designated Funds until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

14.8    **Requests Pursuant to Bankruptcy Rule 2002.**  After the Effective Date, the Wind-Down Administrator or the Liquidating Trustee may, in their sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Wind-Down Administrator and the Liquidating Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

14.9    **No Admissions.**  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by Cetero with respect to any matter set forth herein, including liability on any Claim or Equity Interest or the propriety of any classification of any Claim or Equity Interest.

14.10    **Plan Controls.**  To the extent there is an inconsistency or ambiguity between any term or provision contained in the Disclosure Statement and the Plan, the terms and provisions of the Plan shall control.

14.11    **Governing Law.**  Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal, state, or provincial laws are applicable, the laws of the State of Delaware shall govern the construction, implementation, and enforcement of the Plan and all rights and obligations arising under the Plan, without giving effect to the principles of conflicts of law.

14.12    **Substantial Consummation of Plan.**  The Plan shall be deemed to be substantially consummated on the Effective Date.

14.13    **Binding Effect.**  The Plan shall be binding on and inure to the benefit of (and detriment to, as applicable) Cetero, the Committee, the Wind-Down Administrator, the Liquidating Trustee, all holders of Claims or Equity Interests (whether or not they have voted to accept the Plan), and their respective representatives, successors, and assigns.

14.14    **Severability.**  Should the Bankruptcy Court determine, on or prior to the Confirmation Date, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Equity Interest or Cetero entity, the Bankruptcy Court, at the request of Cetero, shall have the power to alter and modify such provision to make it valid and enforceable to the maximum extent practicable consistent with the original purpose of such provision.  Notwithstanding any such determination, interpretation, or alteration, the remainder of the terms and provisions of the Plan shall remain in full force and effect.

14.15    **Notices and Distributions.**  On and after the Effective Date, all notices, requests, and distributions to a holder of a Claim or Equity Interest shall be sent to the last known address of (a) the holder or its attorney of record as reflected in the holder's proof of Claim or Administrative Expense Claim filed by or on behalf of such holder, or (b) if there is no such evidence of a last known address, to the last known address of the holder according to the books and records of Cetero.  Any holder of a Claim or Equity Interest may designate another address for the purposes of this Section by providing the Wind-Down Administrator and the Liquidating Trustee written notice of such address, which notice will be effective upon receipt by Cetero of the written designation.  Any notices to Cetero, the Wind-Down Administrator, or the Liquidating Trustee or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid or (b) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

       **To Cetero:**

       Marc J. Carmel
       Christian M. Auty
       PAUL HASTINGS LLP

191 North Wacker Drive, Thirtieth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

**To the Wind-Down Administrator:**

Carl Marks Advisory Group LLC
900 Third Avenue, 33rd Floor
New York, New York 10022-4775
Attention: J. Richard Walker

**To the Committee:**

Bradford J. Sandler
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

**To the Liquidating Trustee:**

Contract Research Solutions Liquidating Trust
c/o United Bankruptcy Services, LLC
P.O. Box 219
Perkiomenville, Pennsylvania 18074
Facsimile: (267) 797-1079

14.16    **Withholding and Reporting.**  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Wind-Down Administrator and the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding and reporting requirements.  Notwithstanding anything herein to the contrary, in calculating and making the payments due to Allowed Claims hereunder, the Wind-Down Administrator and the Liquidating Trustee shall be authorized to deduct from such payments any necessary withholding amount.

14.17    **Other Documents and Actions.**  In consultation with the Committee (if before the Effective Date) or the Liquidating Trustee (if after the Effective Date), Cetero and the Wind-Down Administrator may execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in the Plan or the terms of the Plan, without any further action by or order of approval of the Bankruptcy Court.

14.18    **Allocation of Plan Distributions.**  All distributions in respect of Claims will be allocated first to the original principal amount of such Claims (as determined for federal income tax purposes), with any excess allocated to the remaining portion of such Claims.

14.19    **Dissolution of Committee.**  The Committee appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code shall be dissolved on the Effective Date, and the Committee shall be relieved of all of its obligations and duties under the Bankruptcy Code.

14.20    **Claims Agent.**  Notwithstanding any other document filed in the Chapter 11 Cases to the contrary, 60 days after the Effective Date, the Claims Agent may cease to maintain or provide access to the website maintained by the Claims Agent at http://dm.epiq11.com/crs, provided that a copy of all filed claims be delivered prior to such time to the Liquidating Trustee in electronic format.

*[Remainder of page intentionally left blank.]*

Dated:  September 6, 2012

ALLIED RESEARCH HOLDINGS INC.
ALLIED RESEARCH INTERNATIONAL, INC. (FLORIDA)
ALLIED RESEARCH INTERNATIONAL INC. (ONTARIO)
ALLIED RESEARCH INTERNATIONAL INDIA, LLC
ALLIED RESEARCH INTERNATIONAL U.S., LLC
BA RESEARCH CO.
BA RESEARCH INTERNATIONAL HOLDINGS, LLC
BA RESEARCH INTERNATIONAL, L.P.
BARI MANAGEMENT, LLC
BARI MERGER SUB, LLC
BARI PARTNERS, G.P.
BIOASSAY RESEARCH CO.
CONTRACT RESEARCH SOLUTIONS, INC.
CRS MANAGEMENT, INC.
CRS REAL ESTATE HOLDINGS LLC
DIABETES AND GLANDULAR DISEASE RESEARCH
        ASSOCIATES, INC.
GATEWAY MEDICAL RESEARCH, INC.
PRACS DERMATOLOGY, LLC
PRACS INSTITUTE, LTD.
SPECIALTY RESEARCH, INC.


By: _____
Name:  Michael T. Murren
Title:    President, Chief Financial Officer, Treasurer, and Secretary